**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| YOHANCE LACOUR, CAROL MARIN, PHILIP ROGERS, ROBIN AMER, LINDSEY DORCUS, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Plaintiffs, Yohance Lacour, Carol Marin, Philip Rogers, Robin Amer, Lindsey Dorcus, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Apple Inc. ("Apple"), allege as follows:

**NATURE OF THE CASE**

1. "What happens on your iPhone, stays on your iPhone." Apple has spent more than a decade marketing privacy as its defining commitment. Apple has placed billboards along American highways announcing that "Privacy. That's iPhone." Apple has built Touch ID, Face ID, Personal Voice, App Tracking Transparency, on-device processing, the Secure Enclave, and Private

Cloud Compute, and has marketed each as architectural proof that Apple, unlike its competitors, protects the private information of the people who use its products. Apple's CEO has called privacy "a fundamental human right." Apple has positioned this privacy commitment as the difference between Apple and every other technology company in the world.

2.      Behind that commitment, Apple built its commercial voice synthesis technology by extracting voiceprints from recordings of real people, without their knowledge or consent. Apple's voice models speak in synthetic human voices in more than thirty languages, narrate audiobooks marketed as indistinguishable from those produced by human performers, generate Siri's speech across more than two billion active devices, and clone a user's voice from a brief on-device recording session. The technology behind these products was not built from nothing. It was built on voiceprints. Plaintiffs' voiceprints are among them.

3.      Plaintiffs are six Illinois residents whose recorded voices are among the most distinguished in their fields. They include Philip Rogers, an Emmy- and Edward R. Murrow Award-winning broadcaster whose four decades of on-air reporting were based in Chicago; Carol Marin, a five-decade broadcast journalist, a three-time Peabody winner, and a recipient of the 2025 Order of Lincoln, Illinois's highest civilian honor; Robin Amer, the creator, host, and showrunner of USA Today's *The City* and a three-time duPont-Columbia honoree; Lindsey Dorcus, a SOVAS Voice Arts Award-winning narrator of more than two hundred audiobooks for the major American publishers; Yohance

2

Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them was told that their voices were being used to train Apple's commercial voice AI. None of them was asked. None of them consented.

4. To build the technology that powers Apple's voice products, Apple took recordings of real human voices, fed them into a training pipeline to extract each speaker's voiceprint, and used those voiceprints to develop commercial products that contribute to Apple's approximately $416 billion in annual revenue and its more than $4 trillion market capitalization. The voices belonged to journalists, podcasters, audiobook narrators, voice actors, and other performers who were never informed that their vocal identities were being captured, never told why, and never given the chance to object.

5. A voiceprint is a digital fingerprint of the human voice, a mathematical representation of the acoustic features (pitch, timbre, resonance) that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their

3

voice. The biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

6. Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to prevent exactly this. The Illinois General Assembly recognized that biometric identifiers, including voiceprints, are "unlike other unique identifiers" because they are "biologically unique to the individual" and, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before a private entity may collect a biometric identifier, it must inform the subject in writing, disclose the specific purpose and duration of collection, and obtain a written release. 740 ILCS 14/15(b). Apple complied with none of these requirements with respect to Plaintiffs or the Class. It did not notify Plaintiffs that their voiceprints were being collected. It did not tell them why. It did not tell them for how long. It did not obtain a written release. It did not develop or publish a retention and destruction policy applicable to the voiceprints it extracted from non-users. Apple treated the voices of real people as unencumbered raw material for commercial products, without a word to the people whose voices made the products possible, and without permission or compensation.

7. The privacy commitment Apple markets to its users is the same one it denied to Plaintiffs and the Class. Apple is institutionally defined by its sophistication in handling biometric data. Apple's Touch ID, Face ID, and Personal Voice systems store user biometric data exclusively within the Secure Enclave, a dedicated hardware coprocessor isolated from the main application

processor. Apple has publicly committed that this biometric data is never transmitted off the device, never made available to Apple itself, and never made available to applications. Apple's Personal Voice feature, released in September 2023, applies parallel protections to user voice biometric data: on-device recording and fine-tuning, encrypted storage, own-voice-only synthesis, and personal, noncommercial use restrictions. Apple is institutionally capable of building voice-cloning technology with rigorous consent and rights protections. It implemented those protections for its users. It did not implement them, or any equivalent, for the third parties whose voices it had already used to train the foundational voice models that Personal Voice and Apple's other voice products rely upon. The asymmetry was not an accident. It was a choice.

8. Apple was not operating in ignorance of its legal obligations. BIPA has been the law of Illinois since 2008. Apple itself has been a BIPA defendant in Illinois since December 2019 in *Zaluda v. Apple Inc.*, No. 2019-CH-11771 (Cir. Ct. Cook Cnty., Ill.), where the Circuit Court of Cook County certified a class of approximately 2.6 to 3.9 million Illinois Siri users on January 29, 2026. Apple agreed in January 2025 to pay $95 million to settle related federal claims about Siri-related voice data in *Lopez v. Apple Inc.*, No. 4:19-cv-04577 (N.D. Cal.). BIPA litigation had produced some of the largest privacy settlements in American history, including settlements involving Facebook ($650 million), Google ($100 million), and TikTok/ByteDance ($92 million); parallel state biometric statutes had produced more recent settlements of $1.4 billion (Texas-Meta) and $1.375 billion (Texas-Google). Apple chose to build its

commercial voice synthesis models without complying with BIPA. That was not an oversight. It was a business decision.

9.      Apple's silence about its voice training data is itself probative. Apple has never disclosed the sources, scale, or provenance of the voice data used to train the foundational voice synthesis models that power Siri, Personal Voice, or "Narrated by Apple Books" digital narration. Apple has published no model card, data sheet, training-data manifest, or transparency report for its voice synthesis pipeline. The contrast with Apple's general-purpose Apple Intelligence text foundation models is conspicuous: in July 2024, Apple expressly described its text-model training data as drawn from "data we have licensed from publishers, curated publicly available or open-sourced datasets and publicly available information crawled by our web crawler, Applebot."[1] No equivalent statement has ever been made about Apple's commercial voice synthesis models. If those models had been trained on properly licensed and consented data, Apple would have an obvious commercial incentive to say so. It has not.

10.     The technology Apple built using Plaintiffs' voices now directly serves the professional markets where Plaintiffs earn their livelihoods. "Narrated by Apple Books" digital narration competes with Plaintiffs Dorcus and Nassif in audiobook narration on the same Apple Books platform through

---

[1] Apple Machine Learning Research, *Introducing Apple's On-Device and Server Foundation Models* (June 10, 2024), https://machinelearning.apple.com/research/introducing-apple-foundation-models (last visited on May 12, 2026); *see also* Tom Gunter et al., *Apple Intelligence Foundation Language Models*, arXiv:2407.21075v1 (July 29, 2024), https://arxiv.org/abs/2407.21075v1 (last visited on May 12, 2026).

which Apple distributes their human narrations. Synthetic podcast and broadcast voices generated by Apple's voice synthesis models compete with Plaintiffs Marin, Rogers, Lacour, and Amer in journalism and podcast production. Apple offers these services at a fraction of the cost of hiring human performers, displacing demand for the very people whose voices were needed to build the technology. The product with which Apple competes against the Plaintiffs is built from the Plaintiffs' own voices.

11. Plaintiffs and the Class have suffered concrete, particularized injuries. Apple invaded their legally protected privacy interest in their own biometric identifiers by extracting voiceprints and biometric information without notice or consent. Apple deprived them of the right, guaranteed by BIPA, to make an informed decision about whether a private entity may collect, store, and use their biometric data. Apple retains their biometric data in its commercial models and continues to profit from it. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that Apple unlawfully collected, retained, commercialized, and disseminated their voiceprints, failed to protect them from disclosure, and did so without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that Apple's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act

("IRPA"). Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

13. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), for violations of BIPA's notice, consent, retention, profiting, dissemination, and protection requirements; (ii) actual damages and disgorgement of profits Apple has earned from the commercial exploitation of Plaintiffs' biometric data; and (iii) injunctive relief requiring Apple to (a) cease collecting biometric identifiers from voice recordings produced or recorded in Illinois without BIPA-compliant consent, (b) identify the sources of the voice training data used to build its voice synthesis models, (c) destroy all voiceprints and biometric information unlawfully obtained from Plaintiffs and the Class, and (d) destroy or retrain, without the unlawfully obtained data, the voice synthesis models, and the downstream commercial products built on those models, in which the unlawfully obtained voiceprints and biometric information are encoded.

## PARTIES

14. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast *You Didn't See Nothin'* was awarded the 2024 Pulitzer Prize for Audio Reporting. Lacour's body of professional voice work, the public

availability of his recordings, and the basis for Plaintiffs' allegation that Apple extracted his voiceprint are described at ¶¶ 76–79, 80-82.

15.     Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade Chicago broadcast journalist and three-time George Foster Peabody Award laureate. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Apple extracted her voiceprint are described at ¶¶ 76–79, 83-85.

16.     Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a four-decade Chicago broadcast journalist whose career at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5) earned him a National Emmy Award. Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Apple extracted his voiceprint are described at ¶¶ 76–79, 86-88.

17.     Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Apple extracted her voiceprint are described at ¶¶ 76–79, 89-91.

18.     Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her

home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Apple extracted her voiceprint are described at ¶¶ 76–79, 92-94.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois and whose audiobook narrations are commercially released by Penguin Random House, Hachette Book Group, and Simon & Schuster. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Apple extracted her voiceprint are described at ¶¶ 76–79, 95-97.

20. Defendant Apple Inc. ("Apple") is a California corporation with its principal executive offices at One Apple Park Way, Cupertino, California 95014. Apple is one of the largest publicly traded companies in the world. Apple owns and operates Siri, Personal Voice, Live Speech, the "Narrated by Apple Books" digital narration program, the SFSpeechRecognizer and SpeechAnalyzer developer APIs, and a substantial speech research program published under the Apple Machine Learning Research banner. Apple's conduct in this case is the conduct of Apple Inc. itself, acting through its officers, directors, employees, contractors, and agents.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied because Plaintiffs are citizens of Illinois, and Defendant Apple Inc. is a California corporation with its principal place of business in California. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

22. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and Plaintiffs may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections, § 15(a), (b), (c), (d), and (e), each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Apple extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals whose recordings were produced or recorded in Illinois. The aggregate damages across

11

the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's $5,000,000 threshold.

23. This Court has specific personal jurisdiction over Apple under the Illinois long-arm statute, 735 ILCS 5/2-209, and consistent with the Due Process Clause of the Fourteenth Amendment. Apple has purposefully directed conduct at Illinois and into this District, and Plaintiffs' claims arise out of or relate to those Illinois-directed contacts.

24. Apple maintains a substantial commercial and operational presence in Illinois. Apple owns and operates Apple Store retail locations throughout the State, including its flagship Michigan Avenue store on the Chicago River, a building Apple designed, built, and opened in 2017 as one of its signature global retail locations, together with stores at Lincoln Park, Oakbrook Center, Old Orchard, Woodfield, Northbrook Court, and other Illinois locations. Apple sells iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, Apple TV, and the full range of Apple-branded products and accessories to Illinois residents through those retail stores, the Apple Online Store, and the App Store. Apple enters into recurring contractual relationships with Illinois residents through the iCloud Terms and Conditions, the Apple Media Services Terms and Conditions, the Apple Developer Program License Agreement, the Apple Card Customer Agreement, and the iOS, iPadOS, macOS, watchOS, and tvOS Software License Agreements, and accepts recurring payments from Illinois subscribers for Apple One, Apple Music, Apple TV+, Apple Arcade, Apple Fitness+, Apple News+, Apple Books, iCloud+, and AppleCare. Each

subscription renewal, each App Store purchase, each Apple Books or Apple Podcasts transaction, and each retail purchase from an Illinois customer is a separate commercial transaction with an Illinois resident. Apple derives substantial revenue from Illinois.

25.     Apple's Illinois contacts are suit-related in four reinforcing respects. *First,* Apple collected, captured, and obtained biometric identifiers, specifically voiceprints, from voice recordings of Illinois residents, including Plaintiffs, without the notice, written release, or other safeguards BIPA requires. The biometric source material, the voice itself, originated in Illinois; the audio recordings of Plaintiffs' voices were created in Illinois while Plaintiffs were physically present there. Apple acquired identifiable Illinois-produced content from platforms, including Apple's first-party Apple Podcasts and Apple Books, on which the speaker's identity and Illinois production location were publicly displayed. The biometric identifiers belong to Illinois residents; the privacy interests invaded are those of Illinois residents; the duty to inform and obtain consent under 740 ILCS 14/15(b) was owed to Illinois persons; and the failure to perform that duty was localized where those persons reside and where their voices were produced and recorded. Apple's act of extracting voiceprints from voice recordings produced or recorded in Illinois is conduct directed at Illinois regardless of the physical location of the servers on which the extraction occurred.

26.     *Second,* the voiceprints and biometric information that Apple extracted are now encoded in foundational voice synthesis models that Apple

deploys in commercial products sold and delivered to Illinois customers—Siri across iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV; Personal Voice; Live Speech; "Narrated by Apple Books" digital narration; Dictation; and related services—through Apple's Illinois retail stores, its online store, the App Store, and the Apple Books and Apple Podcasts platforms. Apple's commercial activity in Illinois is the downstream monetization of the same biometric data extracted at the upstream training stage; the two are different points in the same integrated commercial chain.

27.    *Third*, Apple commercially exploits the voices and identities of Illinois residents in violation of IRPA by developing, marketing, and distributing voice synthesis products to Illinois customers and by disseminating voice-simulative outputs to and within Illinois through its products and services.

28.    *Fourth*, on information and belief, Apple disseminates voiceprints and biometric information, including biometric data derived from Illinois residents' voice recordings, across its corporate infrastructure and to third-party vendors and service providers, including across affiliated entities Apple identifies in its public SEC filings, in violation of § 15(d).

29.    Apple's possession of voiceprints and biometric information derived from voice recordings of Illinois residents is ongoing. BIPA § 15(a) imposes continuing obligations on entities that possess biometric identifiers, including the duty to develop and publish a written retention and destruction schedule. Apple has been in possession of voiceprints derived from Illinois-recorded voice recordings since their collection and remains in possession of those voiceprints

today, encoded in the parameters of the foundation voice models that power Siri, Apple Intelligence, Personal Voice, Live Speech, "Narrated by Apple Books," and Dictation. The persons whose biometric data Apple holds are persons whose voices were produced and recorded in Illinois. Apple's ongoing retention and commercial use of that data is a continuing wrong directed at Illinois-recorded speakers and felt in Illinois.

30. The exercise of specific personal jurisdiction over Apple in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process. Illinois has a strong and particularized interest in providing a forum for redressing the unlawful collection and commercial exploitation of biometric identifiers of persons whose voices were produced or recorded in Illinois — an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5. Plaintiffs, as Illinois residents whose recordings were produced in Illinois and whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating in their home forum. The burden on Apple of litigating in this District is not undue. Apple is a publicly traded company that reported $416.16 billion in net sales for fiscal year 2025 and is an experienced litigant in federal courts across the United States. Apple has been a defendant in voice-privacy litigation in Illinois state court since 2019 in *Zaluda v. Apple Inc.*, No. 2019-CH-11771 (Cir. Ct. Cook Cnty.), and resolved a nationwide Siri voice-privacy class action in January 2025 for $95 million in *Lopez v. Apple Inc.*, No. 4:19-cv-04577 (N.D. Cal.). Apple could reasonably anticipate being haled into court in this District for claims arising from its

15

extraction and commercial exploitation of biometric data sourced from voice recordings produced or recorded in Illinois.

31. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Apple is, within the meaning of 28 U.S.C. § 1391(c)(2), a resident of any judicial district in which it is subject to personal jurisdiction, including this District. Independently, a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District: Plaintiffs reside in this District; Plaintiffs' voice recordings were produced and recorded in this District; Apple's collection, capture, extraction, and commercial exploitation of biometric identifiers belonging to residents of this District occurred without notice, consent, or written release; Apple sells, distributes, and delivers the voice synthesis products built on those biometric identifiers to residents of this District through its retail stores, online store, App Store, Apple Books, Apple Podcasts, and related distribution channels; and the economic and privacy injuries Plaintiffs and Class members suffered are felt in this District where Plaintiffs work, perform, and earn their livelihoods.

## **FACTUAL BACKGROUND**

### *Apple and Its Voice Synthesis Business*

32. Apple's voice-AI lineage began with its April 2010 acquisition of Siri, Inc., a startup spun out of SRI International's DARPA-funded Cognitive Assistant that Learns and Organizes program. Apple has since acquired Novauris Technologies (UK-based automatic speech recognition, 2013), VocalIQ (Cambridge spin-out, 2015), PullString (conversational AI, 2019), and Voysis

(Irish on-device voice AI, 2020). For more than 15 years, through acquisitions and internal development, Apple has continuously operated in voice-AI research and product development.

33. Siri launched on iPhone 4S in October 2011. In 2017, Apple transitioned Siri's voice synthesis from concatenative unit selection, which splices recorded fragments of voice talent, to a deep-learning architecture that learns generative representations of voice. The product cadence accelerated from there: new voice-actor-recorded Siri voices in April 2021; the gender-neutral Quinn voice in March 2022; *"Narrated by Apple Books"* digital narration in January 2023; Personal Voice and Live Speech announced in May 2023 and released in iOS 17 that September; and the Apple Intelligence foundation models announced in June 2024.

34. Apple is one of the largest publicly traded companies in the world. For fiscal year 2025, Apple reported $416.16 billion in net sales and approximately 166,000 employees worldwide. In the first quarter of fiscal year 2026, Apple reported $143.8 billion in net sales and an installed base exceeding 2.5 billion active devices. Siri alone handles approximately 1.5 billion voice requests per day.

35. Apple's voice products at issue span the full range of consumer AI voice technology:

(a) *Siri*, Apple's voice assistant, is deployed across iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV, with voice synthesis

17

in more than thirty languages and speech recognition serving hundreds of millions of users;

(b)    *Personal Voice*, released in iOS 17 in September 2023, an on-device feature that lets a user create a synthetic clone of his or her own voice from prompted recordings, built on a pre-trained acoustic and vocoder base model that Apple publicly describes as trained on the LibriTTS corpus;

(c)    *Live Speech*, which generates spoken audio from typed text in real time during phone and FaceTime calls;

(d)    *"Narrated by Apple Books"*, Apple Books' digital narration program, launched January 2023, distributing synthetic-narration audiobooks generated by voice models trained on human narrators, with synthetic voices including Madison and Jackson for fiction and romance and Helena and Mitchell for non-fiction and self-development;

(e)    *Dictation, Voice Memos transcription, Live Voicemail, and iMessage audio-message transcription*, speech-recognition features deployed across Apple's consumer products; and

(f)    *SFSpeechRecognizer and SpeechAnalyzer*, developer APIs that route Apple's speech models into third-party applications.

36.    Apple does not separately quantify revenue, headcount, or profit for any of these features. They are bundled into Apple's consolidated device-and-services revenue.

37.    Apple's foundational voice synthesis models, the underlying technology layer powering Siri, Personal Voice, *"Narrated by Apple Books,"* and

the developer-API speech models, are common across product lines. A single training pipeline produces the base capabilities that Apple's product organization then deploys across consumer-facing features. The training data is shared. The biometric extraction is shared. The product is the data; the data is the product.

*Apple's Voice Synthesis Technical Pipeline and the*
*Extraction of Voiceprints and Biometric Information*

38.     AI voice synthesis technology works by training computational models on large quantities of recorded human speech.[2] During training, the models learn the acoustic features that distinguish one speaker from another and the general properties that make speech recognizable as natural human communication.[3] The training process extracts and encodes the distinctive acoustic characteristics of individual speakers from the training recordings.[4] These characteristics, commonly referred to in the AI research community as "speaker embeddings,"[5] include features of each speaker's voice such as

---

[2] Sivanand Achanta et al., *On-Device Neural Speech Synthesis*, arXiv:2109.08710 (Sept. 17, 2021), https://arxiv.org/abs/2109.08710 (last visited on May 12, 2026) (describing Apple's Tacotron-based acoustic model paired with a WaveRNN vocoder, trained on speech corpora to synthesize new speech audio).

[3] Apple Machine Learning Research, *Advancing Speech Accessibility with Personal Voice* (Dec. 18, 2023), https://machinelearning.apple.com/research/personal-voice (last visited on May 12, 2026) ("Both the acoustic model and vocoder model are speaker-dependent in a typical TTS system. . . . [W]e add speaker ID as part of the decoder input to learn general voice information during the pretraining stage.").

[4] Id.

[5] Prateeth Nayak et al., *Improving Voice Trigger Detection with Metric Learning*, arXiv:2204.02455 (Apr. 5, 2022), https://arxiv.org/abs/2204.02455 (last visited on May 12, 2026) ("the decoder is trained with metric learning and predicts a personalized embedding for each utterance").

timbre, pitch, resonance, cadence, articulation, phrasing, dynamics, and emotional expression.[6] A speaker embedding is a mathematical representation that captures the biologically and behaviorally unique features of an individual's voice.[7] It is, in both function and substance, a voiceprint and biometric information derived from a voice recording within the meaning of BIPA.

39.     BIPA defines "biometric identifier" to include a "voiceprint." 740 ILCS 14/10. BIPA separately defines "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* Whether the extracted representations are classified as voiceprints, biometric information derived from voiceprints, or both, they fall within BIPA's scope. The label the technology industry uses does not determine the statutory classification. The function of the data does.

40.     Apple's published research and product documentation confirm that Apple's voice synthesis pipeline extracts these characteristics. Apple's 2017 description of Siri's voice synthesis describes the process as building a voice model that can generate new utterances from text by learning from voice-

---

[6] Apple Machine Learning Research, *Advancing Speech Accessibility with Personal Voice* (Dec. 18, 2023), https://machinelearning.apple.com/research/personal-voice (last visited on May 12, 2026)

[7] Apple Machine Learning Research, *Voice Trigger System for Siri* (Aug. 11, 2023), https://machinelearning.apple.com/research/voice-trigger (last visited on May 12, 2026) (describing speaker characteristics as "useful but private").

talent recordings.[8] Apple's 2021 paper on on-device neural speech synthesis describes a Tacotron-style acoustic model paired with a WaveRNN vocoder that synthesizes new speech audio from a learned representation of the source voice and generates new utterances at 24 kHz, three to five times faster than real time.[9] Apple's 2023 Personal Voice research publication describes "voice model pretraining and fine-tuning" explicitly: a base voice model is first trained on a corpus of speech and then specialized to mimic a target speaker, with the cleaned pre-training dataset comprising "300 hours of 1000 speakers" from the LibriTTS corpus.[10] By 2025, Apple's public research extended into speech tokenization (dMel), streaming text-to-speech (SpeakStream), speech-enabled large language models (SELMA), and speaker-characteristic learning (Speaker-IPL).

41.     Apple's wake-word and speaker-recognition research describes voice-derived representations directly. Apple's "Hey Siri" research describes deep neural network classifiers that operate on acoustic features of user speech. Apple's August 2023 research publication *Voice Trigger System for Siri* describes an always-on streaming transformer encoder that processes

---

[8] Apple Machine Learning Research, *Deep Learning for Siri's Voice: On-Device Deep Mixture Density Networks for Hybrid Unit Selection Synthesis* (Aug. 6, 2017), https://machinelearning.apple.com/research/siri-voices (last visited May 12, 2026).

[9] Sivanand Achanta et al., *On-Device Neural Speech Synthesis*, arXiv:2109.08710 (Sept. 17, 2021), https://arxiv.org/abs/2109.08710 (last visited May 12, 2026).

[10] Apple Machine Learning Research, *Advancing Speech Accessibility with Personal Voice* (Dec. 18, 2023), https://machinelearning.apple.com/research/personal-voice (last visited May 12, 2026).

21

incoming audio chunks and maintains audio context, and expressly characterizes the speaker characteristics involved as "useful but private."[11] Apple's metric-learning trigger paper describes computing "a personalized embedding" from a small number of target-speaker utterances.[12]

42. The voiceprints and biometric information extracted during training are not stored as discrete files separate from the resulting models. They are encoded directly into the parameters, the numerical weights, of the foundational voice synthesis models. At this technical layer, the biometric data and the trained model are the same thing. Deleting the underlying training recordings does not remove the voiceprints; they persist in the model weights and continue to inform every output the model generates. Apple's commercial use of the models—every Siri voice request, every Personal Voice synthesis, every "Narrated by Apple Books" audiobook generation, every SFSpeechRecognizer API call—is the ongoing use of the voiceprints encoded within them. The product is the data; the data is the product.

*Apple's Selective Consent Infrastructure*

43. Apple operates an extensive consent and rights infrastructure for the biometric and voice data of its users, and no equivalent infrastructure for the third parties whose voice recordings Apple ingested into the foundational

---

[11] Apple Machine Learning Research, *Voice Trigger System for Siri* (Aug. 11, 2023), https://machinelearning.apple.com/research/voice-trigger (last visited May 12, 2026).

[12] Prateeth Nayak et al., *Improving Voice Trigger Detection with Metric Learning*, arXiv:2204.02455 (Apr. 5, 2022), https://arxiv.org/abs/2204.02455 (last visited May 12, 2026).

training pipelines underwriting its voice synthesis products. The asymmetry is documented in Apple's public-facing privacy materials, technical documentation, and product design choices.

44. For its users, Apple has built written-consent flows: Touch ID enrollment, Face ID enrollment, and Personal Voice creation all involve user-initiated processes in which the user is told what data is being collected, for what purpose, and under what protections. For Personal Voice specifically, released in September 2023, Apple's public design imposes: (i) on-device recording and fine-tuning, so that the user's voice data never leaves the user's device during training; (ii) encryption of the resulting voice model and storage under Apple's Secure Enclave-class cryptographic protections; (iii) a restriction to own-voice only, such that the synthetic voice can be used only to clone the user's own voice and cannot be used to clone third parties; and (iv) a restriction to personal noncommercial purposes.[13]

45. For users of Siri, Dictation, and related speech-recognition features, Apple operates a separate consent regime. Apple's "Ask Siri, Dictation & Privacy" page states that Siri audio is processed on Apple servers in many cases, and that request history (including transcripts and related request data) may be retained for up to two years to develop and improve Siri, Dictation, Search, and limited other language-processing functionality.[14] Apple's "Improve

---

[13] Apple Support, *Create a Personal Voice on iPhone, iPad, or Mac*, https://support.apple.com/en-us/HT213878 (last visited on May 12, 2026).

[14] Apple, *Ask Siri, Dictation & Privacy*, https://www.apple.com/legal/privacy/data/en/ask-siri-dictation/ (last visited on May 12, 2026).

Siri and Dictation & Privacy" page states that, where users opt in, audio recordings, transcripts, and related request data may be stored and used to fine-tune Siri, Search, Voice Control, Translate, and automatic speech recognition models.[15] In August 2019, after a whistleblower reported on Apple's Siri grading program, Apple publicly apologized and restructured the program to make audio retention opt-in, to restrict review to Apple employees, and to improve user controls.

46.    For the text content used to train Apple's general-purpose Apple Intelligence foundation models, Apple has built a website-level consent mechanism. In June 2024, Apple introduced "Applebot-Extended" as a user agent that allows website operators to opt out of having their site content used in generative AI training.[16] Applebot-Extended operates at the website level, not at the speaker level. It is irrelevant to voice training data ingested from audiobook distributors, podcast platforms, or broadcast archives, which is what is at issue in this case.

47.    For the third parties whose voice recordings were ingested into Apple's voice synthesis training pipelines, Apple has built no consent infrastructure at all. No written notice. No disclosure of purpose or duration. No written release. No retention or destruction policy applicable to non-user

---

[15] Apple, *Improve Siri and Dictation & Privacy*, https://www.apple.com/legal/privacy/data/en/improve-siri-dictation/ (last visited on May 12, 2026).

[16] Apple Support, *About Applebot*, https://support.apple.com/en-us/119829 (last visited on May 12, 2026) (describing the introduction of "Applebot-Extended" as an opt-out user agent for use of crawled content in generative-AI training).

training data. No mechanism by which a speaker can determine whether his or her recordings were ingested. No mechanism by which a speaker can request access to, correction of, or deletion of biometric data extracted from those recordings. No mechanism by which a speaker can opt out of future ingestion. The Personal Voice consent architecture exists. The Touch ID consent architecture exists. The Face ID consent architecture exists. The Siri-user consent architecture exists. The Applebot-Extended text-content opt-out exists. The non-user voice-training consent architecture does not exist. The selective consent is not a function of technical impossibility, regulatory ambiguity, or institutional unfamiliarity. It is an institutional choice documented in Apple's contemporaneous product design.

*Apple's Biometric Data Handling for User Data*

48.     Apple is institutionally defined in substantial part by its sophistication in biometric data handling. Apple's Touch ID and Face ID systems are among the most widely deployed consumer biometric authentication systems in the world. Apple's Platform Security documentation describes these systems' protective architecture in detail. Fingerprint data captured by Touch ID is processed by, stored within, and accessible only to the Secure Enclave, a dedicated hardware coprocessor isolated from the main application processor. The fingerprint data is encrypted in the Secure Enclave and is, by Apple's representation, never transmitted off the device, never made available to Apple itself, and never made available to applications. Face ID applies the same architecture: facial geometry data captured by Face ID is

processed by, stored within, and accessible only to the Secure Enclave; it is encrypted; and it is never transmitted off the device, never made available to Apple itself, and never made available to applications.

49.     Apple's Personal Voice feature applies parallel protections to user voice biometric data, as alleged at ¶ 44. The on-device fine-tuning means the user's voice data never leaves the user's device during training; the voice model is encrypted; and use is restricted to the user's own voice and to personal noncommercial purposes.

50.     The protections Apple applies to user biometric data—Touch ID, Face ID, and Personal Voice—operate at multiple reinforcing layers: hardware isolation (Secure Enclave), cryptographic encryption (on-device, at rest, and in transit), on-device processing (no transmission to Apple servers), scope restrictions (use limited to authentication or own-voice synthesis), and access restrictions (Apple itself is excluded from access).

51.     Apple's protection of the non-user voiceprints and biometric information at issue in this case is, by contrast, undocumented, unannounced, and undefended in the public record. Apple has never publicly identified that it possesses voiceprints or biometric information extracted from non-user training recordings. Apple has never described the storage location, transmission protocols, encryption regime, access controls, or retention practices applicable to those voiceprints. Apple has never made publicly available a retention and destruction policy applicable to non-user voiceprints, as required by 740 ILCS 14/15(a). Apple has avoided the words "voiceprint,"

"speaker embedding," and "biometric identifier" in its public-facing voice-data disclosures, despite Apple's fluency with biometric terminology elsewhere, reflecting an institutional choice not to take a definitive position on whether its voice processing implicates biometric privacy law.

52. On information and belief, Apple does not store the voiceprints and biometric information extracted from non-user training recordings within the Secure Enclave; does not isolate them from Apple's general server infrastructure; does not process them on-device only; does not restrict their use to a narrow authentication or own-voice purpose; and does not withhold access from Apple itself. The voiceprints and biometric information at issue here are, on information and belief, encoded in the parameters of Apple's foundational voice synthesis models, transmitted across Apple's internal corporate and cloud infrastructure, and deployed in commercial products distributed globally on iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV. The asymmetry between Apple's protection of user biometric data and Apple's protection of non-user voiceprints is, in operational terms, total: one category is protected as the most sensitive data Apple's systems handle; the other has no documented protection at all.

*Apple's Training-Data Acquisition Practices*

53. Apple has never disclosed the sources, scale, or provenance of the voice data used to train the foundational voice synthesis models that power Siri's text-to-speech voices, Personal Voice's pre-trained acoustic and vocoder models, or the "Narrated by Apple Books" digital narration voices. Apple has

27

not published a model card, a data sheet, a training-data manifest, or any transparency report identifying what voice recordings it used, where it obtained them, or whether any of the speakers consented.

54.     The only publicly disclosed training data Apple has provided regarding its voice synthesis pipeline appears in its December 2023 Personal Voice research paper. There, Apple stated that the pre-trained acoustic and vocoder models on which Personal Voice fine-tuning sits were trained on the LibriTTS dataset, comprising approximately 300 hours of speech from approximately 1,000 speakers. The LibriTTS dataset is derived from LibriVox, a volunteer-run audiobook project in which individual narrators read public-domain books and donate their recordings under a non-restrictive license intended for audiobook listening, not for use as the substrate for a commercial voice-cloning feature. On information and belief, the LibriVox volunteer narrators whose recordings constitute the LibriTTS corpus did not consent to the extraction of their voiceprints or biometric information for the purpose of building a commercial voice-cloning product; were not informed by Apple of any such use; and were not paid for it.

55.     The Personal Voice paper's LibriTTS admission is the only voice-training corpus Apple has ever publicly disclosed. It is not the only one. Producing the multilingual Siri voices Apple ships in over thirty languages, the four *"Narrated by Apple Books"* digital narration voices, and the consumer-grade voice quality on which Apple's products depend cannot be achieved with 300 hours of speech from 1,000 speakers. On information and belief, Apple's

foundational voice synthesis training corpora aggregate to tens of thousands of hours of speech from tens of thousands of distinct speakers, sourced from a combination of licensed voice-talent recordings, publicly available audio platforms (including audiobook distribution platforms, podcast directories, streaming services, YouTube, and broadcast archives), and Apple's first-party platforms (Apple Podcasts and Apple Books).

56. The most concrete documented instance of Apple's training-data acquisition practices is the Findaway Voices controversy of February 2023. In January 2023, Apple launched *"Narrated by Apple Books"* digital narration, releasing a slate of synthetic voices marketed as "digital voice[s] based on a human narrator." Within weeks, public reporting revealed that Apple had obtained training audio for its synthetic narration voices through Findaway Voices, a Spotify-owned audiobook distributor, under a contract clause that authorized Apple to "use audiobook files for machine learning training and models."[17] Authors and audiobook narrators publicly stated that they had not been told of, and had not consented to, this use.[18] Following intervention by SAG-AFTRA, Apple agreed in February 2023 to halt "use of files for machine

---

[17] Shubham Agarwal, *Audiobook Narrators Fear Apple Used Their Voices to Train AI*, Wired (Feb. 14, 2023), https://www.wired.com/story/apple-spotify-audiobook-narrators-ai-contract/ (last visited May 12, 2026).

[18] Wesley Hilliard, *Audiobook Narrators Complain Apple May Have Used Them to Train AI Voices*, AppleInsider (Feb. 14, 2023), https://appleinsider.com/articles/23/02/14/audiobook-narrators-complain-apple-may-have-used-them-to-train-ai-voices (last visited May 12, 2026).

learning purposes," with the halt covering "all files dating back to the beginning of this practice."[19]

57. The Findaway halt does not repair the underlying violation. Apple has not publicly identified which audiobook files it ingested, how many narrators' voices contributed to its synthetic narration models, or whether the synthetic voices Apple now sells through Apple Books still contain biometric information derived from those files. The halt addresses future ingestion. It does not address the voiceprints and biometric information already extracted, already encoded in Apple's foundational models, and still being deployed in Apple's commercial products.

58. Apple affirmatively accessed recordings attributable to individual speakers, recordings containing metadata identifying the speaker and the geographic origin of the content, and recordings published on platforms where the speaker's identity, location, and body of work were publicly associated with the recordings. YouTube, Apple Podcasts, Spotify, Audible, Apple Books, and Findaway-distributed channels, the platforms on which Plaintiffs' and Class members' recordings are available, display creator profiles that include the creator's name, geographic location, channel or artist description, and content catalog. This identifying information was visible and accessible to Apple at the time of data acquisition. Apple's sourcing of voice recordings from these platforms was not geographically blind. It involved accessing content from

---

[19] Id.

identified speakers whose association with specific locations, including Illinois, was publicly visible. Apple Podcasts and Apple Books are Apple's first-party platforms, to which Apple maintains full crawl access for all metadata associated with each episode or title.

59.     The conspicuous absence of any affirmative training data claim for Apple's voice synthesis models, in contrast to Apple's transparency about its general-purpose Apple Intelligence text foundation models, confirms the institutional posture. In its July 2024 disclosure of its on-device and server foundation language models, Apple expressly described its text-model training data as drawn from "data we have licensed from publishers, curated publicly available or open-sourced datasets and publicly available information crawled by our web crawler, Applebot." No equivalent affirmative statement has ever been made about the corpus from which Apple's commercial voice synthesis models were trained. If Apple's voice synthesis models had been trained on properly licensed and consented data, Apple would have an obvious commercial incentive to say so. Apple has not.

*Illinois-Origin Biometric Data*

60.     The biometric data at issue in this case originated in Illinois. Plaintiffs and Class members are speakers whose voices, the biological characteristic from which a voiceprint is derived, were produced while the speakers were physically present in Illinois. The audio recordings embodying those voices were created in Illinois. The recordings were published from Illinois to publicly accessible platforms. The recording-location anchor—that

Class membership turns on whether the voice recordings were produced or recorded in Illinois—flows from the recording's place of creation, not from the speaker's later residence.

61. Apple's extraction of voiceprints and biometric information from Illinois-produced voice recordings is conduct directed at Illinois in three independent respects. *First, the biometric data was generated in Illinois.* The voice is the raw biometric characteristic from which a voiceprint is derived. Each Plaintiff's voice was produced by the Plaintiff while physically present in Illinois. The audio encoding of each Plaintiff's voice—the recording itself—was created in Illinois. The voiceprint Apple extracted from that audio encoding is a derivative of biometric source material that originated in Illinois. The biometric data Apple ingested does not become non-Illinois biometric data by virtue of being processed on Apple servers outside Illinois. The data was generated in Illinois; it remains, in legal substance, Illinois-origin biometric data.

62. *Second, Apple's acquisition was targeted at identifiably Illinois-origin material.* Apple's training-data acquisition was not geographically blind. Apple did not receive an anonymized dataset from a third-party intermediary that scrubbed location information from its contents. Apple sourced recordings from platforms, including Apple's first-party Apple Podcasts and Apple Books platforms, and third-party platforms accessible to Apple's data acquisition pipelines, on which the speaker's name, professional biography, and geographic location were publicly displayed in platform metadata Apple controlled or accessed. Apple's act of accessing and processing each Plaintiff's

recordings involved the acquisition of identifiable Illinois-origin biometric data from an identified Illinois speaker. Apple knew, or with the application of automated metadata-extraction tools available to any AI laboratory operating at Apple's scale, could have known, that the recordings it ingested were produced by Illinois speakers in Illinois.

63. *Third, Apple's ongoing exploitation of the extracted biometric data is directed at Illinois.* The voiceprints and biometric information Apple extracted are encoded in foundational voice synthesis models that Apple deploys in commercial products sold and distributed in Illinois. Apple's Siri, Personal Voice, *"Narrated by Apple Books"* digital narration, Live Speech, Dictation, Live Voicemail, and developer-API speech models all operate on Illinois consumer devices continuously. Apple has not geoblocked Illinois users. Apple processes Siri voice requests, generates synthetic-narration audiobook outputs, and delivers voice-synthesis API outputs into Illinois on every day Apple's products operate. Apple's ongoing possession of Plaintiffs' and Class members' voiceprints, and its continued commercial use of those voiceprints to power products delivered into Illinois, constitutes a continuing wrong directed at Illinois residents and felt in Illinois.

64. The BIPA duties Apple violated run to the persons whose biometric data is at stake. The § 15(b) duty to inform and obtain consent was owed to Illinois persons. The § 15(a) duty to develop and publish a retention policy applies to a private entity in possession of Illinois persons' biometric data. The § 15(c) prohibition on profiting protects Illinois persons whose biometric data is

33

exploited. The § 15(d) prohibition on dissemination protects Illinois persons whose biometric data is disseminated. The § 15(e) duty to protect biometric data from disclosure protects Illinois persons whose biometric data is in the entity's possession. Each obligation runs to the Illinois persons whose data is at stake. The failure to perform each duty—the omission, in the case of §§ 15(a), (b), and (e); the affirmative act, in the case of §§ 15(c) and (d), is localized where those persons reside and where their biometric source material was produced.

*Monetization Through the Integrated Commercial Chain*

65.     Apple monetizes the voiceprints and biometric information at issue in this case through an integrated commercial chain that converts upstream extraction into downstream revenue. The chain has five reinforcing channels.

66.     *Channel One: Consumer devices.* Apple sells consumer devices that depend on the voice technology built using the unlawfully extracted biometric data. iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV each incorporate Siri voice synthesis, speech recognition, and related voice features. Voice features are core to the consumer experience of every Apple device. Apple's installed base of more than 2.5 billion active devices reflects, in part, the commercial value of those voice capabilities. The voiceprints extracted from training data are the technical foundation of the voice features that contribute to that installed base.

67.     *Channel Two: "Narrated by Apple Books" digital narration audiobooks.* Apple Books distributes synthetic narration audiobooks generated

34

by voice models trained on human narrators' voices. The synthetic narration is produced through Apple's authorized aggregator partners (Draft2Digital, Ingram CoreSource, and PublishDrive) for a fraction of the cost of human narration. Apple pays revenue shares to publishers and authors whose books are produced using *"Narrated by Apple Books"* digital narration. Each audiobook generated by the synthetic narration program is a direct commercial product of the voiceprints and biometric information extracted during training.

68. *Channel Three: Subscription services.* Apple offers Apple-branded subscription services—including Apple Music, Apple TV+, iCloud+, Apple Arcade, Apple Books, Apple News+, Apple Fitness+, and AppleCare+—that incorporate voice technology directly or that operate on devices whose voice capabilities depend on Apple's voice models. Apple accepts recurring subscription payments from Illinois and nationwide users and processes those payments as ongoing commercial relationships.

69. *Channel Four: Developer ecosystem and App Store.* Apple's SFSpeechRecognizer and SpeechAnalyzer developer APIs route Apple's voice and speech models into third-party applications distributed through the App Store. On information and belief, Apple's developer APIs handle a substantial portion of all third-party speech-recognition requests on Apple devices. Apple's App Store revenue, including commission on in-app purchases and subscription fees, derives in part from applications that depend on Apple's voice and speech models.

35

70. *Channel Five: Audiobook distribution through Apple Books.* Apple Books is Apple's commercial audiobook distribution platform. Apple distributes human-narrated audiobooks through Apple Books and collects a commercial commission on each sale. Apple Books is also the distribution channel for *"Narrated by Apple Books"* synthetic-narration audiobooks. Because Apple distributes human-narrated audiobooks through Apple Books, Apple already directly possesses and controls copies of those recordings. Apple did not need to scrape narrator recordings from third-party platforms to access them; the recordings were in Apple's first-party catalog. For the audiobook market, Apple's commercial path from voice ingestion to voice product is a closed loop: Apple distributes human narration through Apple Books, ingests it as training data for foundational voice models, and sells synthetic AI narration back through Apple Books. The product Apple competes against the narrators with is built from the narrators' own voices.

71. Each channel of monetization depends on the channel before it: the consumer-device channel depends on the voice features the devices incorporate; the voice features depend on the foundational voice synthesis models; the foundational models depend on the training data; the training data was obtained without notice, consent, or written release from the speakers whose voices the data embodies. The integrated commercial chain is the conversion mechanism by which Apple turns unconsented biometric extraction into ongoing commercial revenue.

*Dissemination Across Corporate and Cloud Infrastructure*

72. Apple does not operate its voice synthesis products from a single self-contained facility. Apple operates a global corporate infrastructure of subsidiaries, affiliates, and processors, and uses third-party cloud and content-delivery infrastructure to deliver voice products to its global user base. Apple's 2025 Form 10-K identifies material subsidiaries, including Apple Operations International, Apple Distribution International Ltd. (Ireland), Apple Operations Europe, Apple Singapore Pte. Ltd., Apple South Asia Pte. Ltd., and Beats Electronics, LLC, among others. Apple Distribution International Ltd. and Apple Operations Europe handle the international distribution of Apple's voice-enabled products and services. Apple's regional subsidiaries operate the local infrastructure through which Siri voice requests, Personal Voice synthesis, and "Narrated by Apple Books" audiobook outputs are delivered to users worldwide. The voiceprints encoded in Apple's foundational voice synthesis models traverse this corporate and infrastructure network in the ordinary course of Apple's voice business.

73. On information and belief, Apple shares voice data, including voiceprints and biometric information derived from training data, with its affiliates, subsidiaries, vendors, and service providers across jurisdictions. The foundational voice synthesis models and the voiceprints encoded within them have been transferred among Apple's affiliated entities and to third-party cloud infrastructure partners in the ordinary course of training, evaluating, deploying, and operating Apple's commercial voice products. Each such

transfer is a separate act of dissemination under 740 ILCS 14/15(d), conducted without the consent of the Plaintiffs and Class members whose voiceprints were transferred.

74. Apple has publicly announced one piece of its server-side AI infrastructure, Private Cloud Compute, and has described it as cryptographically isolated, access-restricted, and engineered to keep user data private. Apple has not publicly disclosed where its voice training data is hosted, where its trained voice models are stored, which Apple subsidiaries or third-party processors have access to either, or what protections, if any, apply. The infrastructure Apple announces and protects is the infrastructure that holds user data. The infrastructure that stores non-user voiceprints and the models in which they are encoded are undisclosed and not documented in the public record.

75. Apple operates a "Data and Privacy" portal through which Apple Account holders may request copies of, corrections to, and deletion of data Apple holds about them. The portal is limited to users with Apple Accounts and only accesses user-side data. It provides no mechanism for non-users, including Plaintiffs and Class members, to determine whether Apple has extracted their voiceprints, to request access to or deletion of those voiceprints, to learn which Apple entities or third-party processors hold that data, or to opt out of future ingestion. The non-user access mechanism does not exist.

*Named Plaintiffs*

*Allegations Common to Each Named Plaintiff*

76.     On information and belief, the voice recordings of each named Plaintiff were among the audio that Apple ingested to train its foundational voice synthesis models, and the voiceprints and biometric information derived from those recordings are encoded in the parameters of those models and reproduced in the audio that those models generate. Each named Plaintiff's catalog of professional voice work matches the profile of training audio that Apple's technical documentation identifies as optimal: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on publicly distributed audio platforms, including Apple's first-party Apple Podcasts and Apple Books platforms.

77.     Apple has not disclosed, and has refused to disclose, the sources of the voice training data used to develop its foundational voice synthesis models. The records identifying which specific voice recordings Apple ingested into the training corpora that produced the foundational voice models and the commercial voice products derived from those models are within Apple's exclusive control.

78.     No named Plaintiff created an account with Apple for the purpose of contributing voice data to Apple's training pipeline. No named Plaintiff uploaded a voice recording to Apple's training pipeline. No named Plaintiff executed any terms of service authorizing Apple's use of their voice for biometric extraction or model training. No named Plaintiff received any

39

notification or disclosure from Apple that their voice recordings were being collected, that voiceprints or biometric information were being extracted, that their biometric data was being retained, or for what purpose or duration. No named Plaintiff executed a written release authorizing Apple's collection of their biometric data. Apple's collection of each named Plaintiff's voiceprint, and Apple's continuing possession and commercial exploitation of that voiceprint, occurred and continues without that Plaintiff's knowledge or consent.

79. The injury Apple inflicted on each named Plaintiff is concrete and particular to that Plaintiff and shares the same structure across all of them. Apple extracted each Plaintiff's voiceprint from recordings the Plaintiff produced in Illinois, encoded that voiceprint in the foundational voice synthesis models, and continues to profit from those models and from the commercial products built on them. The voiceprint cannot be recovered or replaced; it is the same biological and behavioral signature the Plaintiff uses to speak. The voice synthesis products Apple built using each Plaintiff's voiceprint now operate in the same professional voice markets in which the Plaintiff built and continues to build a career, in a competitive position the Plaintiff neither chose nor authorized.

*Yohance Lacour*

80. Plaintiff Lacour is a writer, journalist, audio storyteller, playwright, and entrepreneur from the South Side of Chicago whose professional work centers on storytelling about Black Chicago. Lacour is affiliated with the Invisible Institute, a Chicago-based nonprofit investigative journalism

organization. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio, in which Lacour revisits the 1997 hate-crime attack on Lenard Clark that Lacour had covered as a young community journalist, tracks down key participants in the case a quarter-century later, and examines how the case and its aftermath shaped his own life. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series. In 2024, *You Didn't See Nothin'* was awarded the Pulitzer Prize for Audio Reporting and a Peabody Award. The series was named among Apple Podcasts' "Podcasts We Love" and the "100 Best Podcasts of All Time," and received nominations at the Signal Podcasting Awards and four nominations at the Black Podcasting Awards. Lacour has also appeared as a featured guest on NPR's Fresh Air with Tonya Mosley, NPR's All Things Considered with Adrian Florido, the Canadian Broadcasting Corporation's Crime Story podcast, and the Pulitzer Prize Board's Pulitzer on the Road podcast. All of Lacour's recorded audio storytelling and journalism work was produced and recorded in Chicago, Illinois. See ¶¶ 76–79.

81.     *You Didn't See Nothin'* and Lacour's interview appearances are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, Overcast, and other major podcast and digital-audio platforms, with metadata identifying Lacour as creator, host, narrator, and lead reporter. Apple Podcasts' editorial recognition of *You Didn't See Nothin'* among its "100 Best Podcasts of All Time" indicates that Apple's content systems identified the series as high-recognition audio content on Apple's first-party platform, for

which Apple maintains full crawl access to all episode metadata. The recordings have been continuously available since 2023, preceding Apple's training of multiple voice models alleged in this Complaint.

82. Lacour's injury is concrete and particular to him in the manner alleged at ¶ 79. Lacour's professional identity is defined by his work as an investigative audio storyteller and narrator from the South Side of Chicago, a market position in which authentic, place-specific Black narration is the core product. The investigative and narrative podcast markets in which Lacour earns his livelihood, including markets reaching the Black audiences and communities about whom Lacour reports, are markets Apple's voice synthesis products are designed to serve at a fraction of the cost of human production. The technology built using Lacour's voiceprint operates in the same audio markets, long-form narrative audio journalism, podcast production, and investigative storytelling, in which Lacour earns his living, and is distributed through the same Apple Podcasts platform on which *You Didn't See Nothin'* was recognized by Apple's editorial systems.

*Carol Marin*

83. Plaintiff Marin is one of the most decorated broadcast journalists in American television history, with a career spanning nearly five decades in on-air television and radio journalism conducted substantially in and from Chicago. Marin's on-air work has aired on NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, the CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel, and includes television anchoring,

investigative reporting, debate moderation, documentary narration, and long-form interviewing. Her career has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award. Marin has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and awarded her the Order of Lincoln, the State of Illinois's highest civilian honor. All of Marin's voice work was produced and recorded in Chicago, Illinois. See ¶¶ 76–79.

84.     Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC Chicago digital archive at nbcchicago.com; and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly accessible. Each platform displays metadata identifying Marin as the speaker, the producing program, and Chicago as the production location. Marin's body of work has been continuously available through these channels for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint.

85. Marin's injury is concrete and particular to her in the manner alleged at ¶ 79. The broadcast and investigative journalism markets in which Marin built her five-decade career, television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing, are the markets in which Apple's voice synthesis products now operate. The "Narrated by Apple Books" digital narration voices for non-fiction and current affairs (Helena and Mitchell) and the broadcast-quality Siri voices Apple ships in over thirty languages compete in the same audio markets, long-form non-fiction narration, broadcast-style delivery, authoritative female-voice presentation, that Marin's career anchored. The technology built using Marin's voiceprint competes in the same markets and against the same colleagues with whom she spent her career.

*Philip Rogers*

86. Plaintiff Rogers is a retired, award-winning broadcast journalist whose career spans more than four decades in radio and television news, conducted in and from Chicago. Rogers's voice-based and oral journalism work, spanning on-air radio reporting at WBBM Newsradio (CBS), on-air television reporting and anchoring at WMAQ-TV (NBC 5), and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events, has been disseminated across major broadcast platforms. His career has been recognized with multiple Emmy Awards including a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and

44

multiple Peter Lisagor Awards from the Chicago Headline Club. The Peter Lisagor Awards, conferred by Chicago's professional journalism organization, recognize excellence in journalism conducted within the Chicago metropolitan region. All of Rogers's voice work was produced and recorded in Chicago, Illinois. See ¶¶ 76–79.

87. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. The catalog is continuously available through the NBC Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting from war zones, mass shootings, corruption trials, the Olympic Games, and other major events. Each platform on which Rogers's recordings appear displays metadata identifying Rogers as the speaker and Chicago as the production location. Rogers's body of work has been continuously available through these channels for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint.

88. Rogers's injury is concrete and particular to him in the manner alleged at ¶ 79. The broadcast journalism market in which Rogers built his career, live broadcast reporting, on-air anchoring, and broadcast investigative journalism, is the market in which Apple's commercial voice synthesis products now operate. Apple ships Siri voices in over thirty languages marketed as broadcast-quality voice synthesis, and the "Narrated by Apple

45

Books" non-fiction digital narration voices Helena and Mitchell compete in the broadcast-style narration categories in which Rogers's career was built. The technology built using Rogers's voiceprint competes in the same markets and against the same colleagues with whom he spent his career, and continues to be used in products Apple ships globally.

*Robin Amer*

89.    Plaintiff Amer is a journalist, podcast creator, audio producer, and on-air host with more than twenty years of experience in digital, broadcast, and print media, who has produced the substantial majority of her audio work from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the investigative podcast produced by USA Today over two seasons. Season 1 of *The City*, which focused on Chicago, peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by The New Yorker, The New York Times, Quartz, and Apple Podcasts. Amer's earlier production work for *Gravy*, the podcast produced by the Southern Foodways Alliance, contributed to that program's 2015 James Beard Award for Best Podcast. Amer subsequently spent three years as Senior Producer for Audio Features at The Washington Post, where she edited the Post Reports daily news podcast and produced the standalone narrative series *Field Trip*; during her tenure she won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for Best

Independent Non-Fiction. The substantial majority of Amer's voice recordings were produced in Chicago, Illinois. See ¶¶ 76–79.

90. *The City, Gravy, Post Reports, Field Trip, and Love + Radio: Blood Memory* are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, and other major podcast and digital-audio platforms, with metadata identifying Amer as host, narrator, producer, showrunner, or contributor. Apple Podcasts' editorial designation of *The City* as Best Podcast of the Year establishes that Amer's recordings were known to, and curated by, Apple within Apple's own content systems. Apple Podcasts is a first-party Apple platform to which Apple maintains full crawl access for all metadata associated with each episode, including episode-level speaker identification, geographic location, and production credits. Amer's body of audio work has been continuously available across these channels for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint.

91. Amer's injury is concrete and particular to her in the manner alleged at ¶ 79. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting, the market Apple's voice synthesis products are designed to serve at substantially lower cost than the human production Amer provides. Apple's recognition of *The City* on its platform establishes that Amer's recordings were known to Apple as high-value, high-recognition audio content within Apple's own content discovery and curation systems. The technology built using Amer's voiceprint, on information

and belief, now competes with her active professional work in the same long-form narrative podcasting market in which she has built her career.

*Lindsey Dorcus*

92.     Plaintiff Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for many of the largest publishers in the English-language publishing industry, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus is a Society of Voice Arts and Sciences (SOVAS) Voice Arts Award winner, recognized in 2020 as part of the full-cast voice artist ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind*. Dorcus is also a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. AudioFile Magazine, the principal independent trade publication reviewing audiobook narration in the United States, has reviewed Dorcus's narration as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (both Dublin and Northern Irish), French, American Southern, Greek, New England, New York, German, Indian, and Russian. All of Dorcus's audiobook narration work was recorded in a professional home studio in Chicago and produced in Illinois. See ¶¶ 76–79.

93. Dorcus's audiobook narration is publicly distributed across the major audiobook and digital-audio platforms, including Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, and Scribd/Everand. Her complete catalog of narrated titles is searchable and accessible on Audible.com and Apple Books. The recordings are continuously available on these platforms and have been so available for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint. Dorcus's audiobooks have been continuously available through Apple Books, Apple's first-party audiobook distribution platform, for years preceding Apple's training of the foundational voice models at issue, and Apple Books continues to distribute Dorcus's audiobook narrations today. Apple Books is the platform on which Apple itself distributes both human-narrated audiobooks like Dorcus's and the synthetic *"Narrated by Apple Books"* digital narration audiobooks Apple sells in competition with them.

94. Dorcus's injury is concrete, particular, and ongoing in the manner alleged at ¶ 79, and is sharpened by the closed-loop structure of Apple's audiobook commerce: the *"Narrated by Apple Books"* digital narration program operates within the same Apple Books distribution ecosystem in which Dorcus's two-hundred-plus human narrations are sold. The synthetic narration voices Apple offers, Madison and Jackson for fiction and romance, and Helena and Mitchell for non-fiction and self-development, compete directly with audiobook narrators in Dorcus's professional categories. *"Narrated by Apple Books"* digital narration is produced for a fraction of the cost of human

narration, which typically runs $200 to $400 per finished hour and takes one to three months. For Dorcus, the biometric data and the product are, at this point, the same thing: the audiobook narrations Apple distributed through Apple Books became the training material for the AI narration Apple now sells through Apple Books, displacing the human narration market from which Dorcus's recordings came.

*Victoria Nassif*

95.     Plaintiff Nassif is a first-generation Lebanese-Palestinian American professional actor, audiobook narrator, voiceover artist, and intimacy director. Nassif is a trained mezzo-soprano singer whose vocal performance skills extend beyond spoken narration to musical and singing capabilities developed through her classical acting training. Nassif's on-camera work includes multiple episodes of NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Nassif has recorded audiobooks for major publishers, including Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster. Nassif's notable audiobook narration credits include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), for which she served as solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist, which was shortlisted for the Ursula K. Le Guin Prize and named a them Best Book of the Year; Gulf by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every*

50

*Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa featuring stories from Palestinian writers. As a first-generation Lebanese-Palestinian American who speaks Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern characters and settings; this authentic voice work represents a distinctive professional asset in the audiobook narration industry. Nassif's professionally recognized range of accents and dialects includes General American, British (Received Pronunciation and Cockney), Persian, Arabic (Levantine dialect), and American Southern. All of Nassif's audiobook narration and voiceover work was produced and recorded in Illinois. See ¶¶ 76–79.

96. Nassif's audiobook narration is publicly distributed across major audiobook and digital-audio platforms, including Audible, Apple Books, Spotify, Libro.fm, and other major audiobook retailers and subscription services. Nassif's on-camera work for NBC's *Chicago PD* and nationally broadcast commercials is distributed across broadcast and streaming platforms, including NBC and Peacock. Nassif's audiobook recordings are continuously available on these platforms and have been so available for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint. Nassif's audiobooks have been continuously available through Apple Books, Apple's first-party audiobook distribution platform, for years preceding Apple's training of the foundational voice models at issue. Nassif's distinctive cultural and linguistic position, authentic Lebanese-Palestinian American narration with native Arabic-accent capability, is a category of

professional voice work uniquely valuable for training the multilingual and cross-accent voice synthesis capabilities Apple markets in Siri's voices across more than thirty languages.

97.     Nassif's injury is concrete, particular, and ongoing in the manner alleged at ¶ 79. Nassif occupies a distinctive market position as a Lebanese-Palestinian American narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors. Apple's voice synthesis products, including the multilingual Siri voices Apple ships in over thirty languages and the foundational voice models underlying *"Narrated by Apple Books"* digital narration, can now generate Arabic-accented English narration and Levantine Arabic-accented voice content that competes specifically with Nassif's professional niche. As for Dorcus, the audiobook narrations Apple distributed through Apple Books became the training material for the AI narration Apple now sells through Apple Books, displacing the human narration market from which Nassif's recordings came. The technology built using Nassif's voiceprint operates in the precise market, authentic Arabic-accented narration of works by Arab and Palestinian American authors, in which Nassif has built her career, in a competitive position Nassif neither chose nor authorized.

*Commercial Substitution and Economic Harm*

98.     The voice products Apple built using Plaintiffs' and Class members' biometric data are now sold and deployed into the markets where Plaintiffs and the Class earn their livelihoods. Professional audiobook narration has

historically been performed by human narrators at industry rates of approximately $200 to $400 per finished hour, meaning a typical ten-hour novel costs $2,000 to $4,000 to narrate and takes one to three months to produce.

99. The *"Narrated by Apple Books"* digital narration program generates professional-quality narration at a fraction of those rates. The synthetic narration is produced through Apple's authorized aggregator partners (Draft2Digital, Ingram CoreSource, and PublishDrive) and approved by Apple in approximately one to two months, compared with the one to three months required for human narration. Once a manuscript is submitted, Apple's foundational voice models can render an entire audiobook in hours of compute time, compared with the dozens of hours of recording, editing, and quality control required for human production. The synthetic voices Apple offers, Madison and Jackson for fiction and romance and Helena and Mitchell for non-fiction and self-development, compete directly with the work of human audiobook narrators in those genres. Apple's commercial deployment of *"Narrated by Apple Books"* through Apple Books directly substitutes for human voice professionals in the audiobook narration market, the market in which Plaintiffs Dorcus and Nassif distribute their human narrations through the same Apple Books platform.

100. Apple's voice synthesis products directly substitute for, or threaten to substitute for, long-form investigative audio journalism, podcast hosting and narration, on-air broadcast journalism, and narrative non-fiction audio

production, the markets in which Plaintiffs Marin, Rogers, Amer, and Lacour have built their careers and continue to work. Apple's foundational voice synthesis models generate substitutable voice content in those markets at consumption-based pricing and per-character API rates orders of magnitude lower than human-talent rates. Siri's broadcast-quality voice synthesis across more than thirty languages, the *"Narrated by Apple Books"* non-fiction and current-affairs voices Helena and Mitchell, and the SFSpeechRecognizer and SpeechAnalyzer developer APIs that route Apple's voice models into third-party applications collectively cover the full range of long-form professional audio markets in which the broadcast journalist and podcaster Plaintiffs operate.

101. Apple's voice synthesis products are marketed and deployed for studio dubbing, e-learning narration, advertising voiceover, conversational AI, video-game voice acting, and customer-service voice work. Each of these markets has historically been served by professional voice actors, including Plaintiffs Dorcus and Nassif. Apple's voice synthesis products generate substitutable voice content in those markets at pricing orders of magnitude lower than human voice talent rates.

102. Apple's voice synthesis capabilities span more than thirty languages and locales. On information and belief, Apple's multilingual and accented synthesis capabilities include the capability to generate Arabic-accented English narration, Levantine Arabic narration, and other culturally and linguistically specific voice content. This capability competes specifically with the distinctive market position held by Plaintiff Nassif as a Lebanese-

54

Palestinian American audiobook narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors.

103. Each of Apple's voice products was built using the vocal characteristics of the human performers it now displaces. The market substitution is therefore not merely temporal but causal. The synthetic audio Apple generates is generated because the performers' voiceprints were extracted from their recordings and embedded in the model parameters that produce the output. The product is the data; the data is the product.

*Apple Acted Willfully and Recklessly*

104. Apple's collection, retention, commercial exploitation, dissemination, and protection-failure with respect to Plaintiffs' and Class members' voiceprints and biometric information was not the result of inadvertence or unfamiliarity with BIPA. Apple acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

*Apple knew its obligations under BIPA*

105. By the time Apple launched the consumer-facing voice synthesis features at issue, *"Narrated by Apple Books"* in January 2023, Personal Voice in September 2023, and the successive foundational voice models through 2024 and 2025, BIPA had been the law of Illinois for more than fifteen years and had generated some of the largest privacy settlements in American history: approximately $650 million in *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747 (N.D. Cal.); approximately $100 million in *In re Google Inc. Biometric Information Privacy Litigation*, No. 1:20-cv-04472 (N.D.

55

Ill.); and approximately $92 million in *In re TikTok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill.). Parallel state biometric statutes had produced additional billion-dollar settlements: Texas's $1.4 billion settlement with Meta in 2024 and Texas's $1.375 billion settlement with Google in 2025. The biometric-privacy obligations governing the extraction of biometric identifiers from human-source material were a matter of legislative and judicial record throughout the period during which Apple ingested Plaintiffs' voice recordings.

106.    Voice-AI-specific litigation against companies in Apple's product market sharpened the notice. In May 2024, voice actors filed *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.), alleging that an AI voice company commercialized unauthorized voice clones trained on the plaintiffs' recordings; the court permitted right-of-publicity claims to proceed in July 2025. In August 2024, additional voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.), asserting analogous claims. By the time Apple launched the voice products at issue here, AI voice companies were active defendants in litigation alleging precisely the conduct alleged here: building commercial voice synthesis products on voice recordings ingested without speaker consent.

107.    Apple's notice was not inferred from industry conditions; it was direct and adjudicated. Apple has been a BIPA defendant in Illinois since December 2019 in *Zaluda v. Apple Inc.*, No. 2019-CH-11771 (Cir. Ct. Cook Cnty.), where plaintiffs allege that Apple's automatic speech recognition system creates and stores biometric voiceprints and feature vectors from Siri user

56

audio in violation of BIPA. On January 29, 2026, the Circuit Court of Cook County certified a class of approximately 2.6 to 3.9 million Illinois Siri users. Separately, in *Lopez v. Apple Inc.*, No. 4:19-cv-04577 (N.D. Cal.), Apple agreed in 2025 to pay $95 million to settle claims that Siri unintentionally recorded private conversations and shared them with third parties; final approval was granted in September 2025. Apple was a BIPA defendant in this state, and a federal voice-privacy litigant, throughout the period in which it built and deployed the commercial voice products at issue here.

108. Apple's senior leadership during the relevant training period came from organizations where biometric-privacy compliance was a core operational concern. John Giannandrea served as Apple's Senior Vice President of Machine Learning and AI Strategy from December 2018 until late 2025, joining Apple from Google, the company that paid $100 million to settle BIPA claims and $1.375 billion to Texas for parallel violations. His successor, Amar Subramanya, joined Apple in December 2025 from Microsoft, after roughly a decade at Google leading engineering for the Gemini Assistant. Apple's leadership did not lack institutional familiarity with biometric privacy law.

*Apple knew that voice training extracts biometric identifiers*

109. Apple's published research describes its voice synthesis pipeline in terms that align with BIPA's biometric definitions. Apple's 2017 description of Siri's voice synthesis describes the process as building a voice model that learns from voice-talent recordings to generate new utterances. Apple's 2021 on-device neural speech synthesis paper describes a Tacotron-style acoustic

model paired with a WaveRNN vocoder that synthesizes new speech from a learned representation of the source voice. Apple's December 2023 *Advancing Speech Accessibility with Personal Voice* research publication expressly describes "voice model pretraining and fine-tuning," a process that extracts and encodes the distinctive acoustic characteristics of source speakers. Apple's wake-word and speaker-recognition research describes "personalized embeddings" derived from a small number of target-speaker utterances. Apple built the pipeline, published the research, and shipped the products on that very capability.

110. Apple's institutional language confirms the awareness. Apple's research publication *Improving On-Device Speaker Verification Using Federated Learning With Privacy,* presented at Interspeech 2020, opens with this acknowledgement: "Information on speaker characteristics can be useful as side information in improving speaker recognition accuracy. However, such information is often private." That language is not a marketing slogan; it is a recognition, in Apple's own technical publications, that speaker-specific voice characteristics are simultaneously commercially valuable and protected. A company that characterizes a category of data as "private" in its own research, and then proceeds to extract that data from third-party recordings without notice, consent, or a written release, is not acting in ignorance of its obligations.[20]

---

[20] Filip Granqvist et al., *Improving On-Device Speaker Verification Using Federated Learning With Privacy,* arXiv:2008.02651 (Aug. 6, 2020), https://arxiv.org/abs/2008.02651 (last visited May 12, 2026); *see also* Apple Machine Learning Research, *Improving On-Device Speaker Verification*

111.   Apple's avoidance of biometric terminology in its public-facing voice-data disclosures — the words "voiceprint," "speaker embedding," and "biometric identifier" — despite Apple's fluency with that terminology elsewhere in its biometric documentation, as alleged at ¶¶ 48–51, reflects institutional recognition that Apple's voice processing implicates biometric privacy law and a strategic choice not to take a definitive position on that question.

*Apple chose to apply consent selectively*

112.   The most direct evidence of Apple's willfulness is the contemporaneous design of Personal Voice, alleged at ¶ 44. Apple released Personal Voice as part of iOS 17 in September 2023, with on-device recording and fine-tuning, encrypted storage under Secure Enclave-class cryptographic protections, own-voice-only synthesis restrictions, and personal noncommercial-purpose restrictions. Apple describes Personal Voice publicly as a privacy-protective feature.

113.   Apple's public design of Personal Voice demonstrates that Apple is institutionally capable of building voice-cloning technology with strong consent and rights protections. Apple implemented every one of those protections for the user's own voice. Apple implemented none of them, or any equivalent, for the third parties whose voices it had already used to train the foundational voice models that Personal Voice and Apple's other voice products rely upon.

---

*Using Federated Learning With Privacy*,
https://machinelearning.apple.com/research/improving-on-device-speaker (last visited May 12, 2026).

The same Apple engineers, the same Apple legal department, and the same Apple product organization that designed Personal Voice's user-consent infrastructure designed the training pipeline that ingested Plaintiffs' voice recordings without notice, consent, written release, or any of the protections Apple applied to its users.

114. Apple's privacy reputation is itself probative. Apple has spent more than a decade publicly positioning privacy as a core differentiating value of its products, marketing Touch ID, Face ID, Personal Voice, on-device processing, App Tracking Transparency, and Private Cloud Compute as architectural commitments to user privacy and as a competitive differentiator that sets Apple apart from every other technology company. The asymmetry alleged here is not Apple stumbling on biometric privacy from a position of ignorance. It is Apple, the company that built the most sophisticated consumer biometric-privacy architecture in the technology industry, deliberately withholding that architecture from a category of subjects whose voices it took to build its commercial voice products. The privacy commitment Apple markets to users is the same privacy commitment Apple denied to Plaintiffs and the Class.

115. Apple's decision to apply consent infrastructure to users and to deny it to non-users was a contemporaneous, institutionally deliberate choice. BIPA-compliant collection of voice training data would have required Apple to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting the recording. With training corpora measured in tens of thousands

of hours of speech from tens of thousands of distinct speakers, that compliance burden would have constrained the speed, scale, and quality of Apple's voice synthesis development. Apple chose speed and scale over compliance. That was not an oversight. It was a business decision.

*Apple's training-data acquisition practices confirm deliberateness*

116. Apple's training-data acquisition practices, alleged at ¶ 56, confirm that Apple's noncompliance was institutional choice rather than inadvertent oversight. Every element of the Findaway record is independently probative of willfulness: the practice existed; the contractual instrument expressly contemplated machine-learning training; Apple's agreement to halt the practice reflects Apple's recognition that the practice required correction; and the retroactive scope of the halt — "dating back to the beginning of this practice" — confirms Apple's knowledge of the scope of the conduct.

117. The Findaway halt did not repair the underlying violation. Apple has not publicly identified which audiobook files it ingested, how many narrators' voices contributed to its synthetic narration models, or whether the synthetic voices Apple now sells through Apple Books still contain biometric information derived from those files. Apple's parallel LibriTTS practice, alleged at ¶ 54, confirms the pattern: Apple ingested approximately 300 hours of speech from approximately 1,000 LibriVox volunteer narrators whose recordings were donated for audiobook listening, not for ingestion into a commercial voice-cloning product, without seeking renewed consent from any LibriVox speaker.

118. The conspicuous absence of any affirmative training-data claim for Apple's voice synthesis models, by contrast with Apple's transparency about other AI work, confirms the institutional posture. In Apple's July 2024 disclosure of its on-device and server foundation language models, Apple expressly described its text-model training data as drawn from "data we have licensed from publishers, curated publicly available or open-sourced datasets and publicly available information crawled by our web crawler, Applebot." No equivalent affirmative statement has ever been made about the corpus from which Apple's voice synthesis models were trained. If Apple's voice synthesis models had been trained on properly licensed and consented data, Apple would have an obvious commercial incentive to say so. Apple has not.

119. Apple's pattern of post-hoc corrective conduct further confirms the institutional awareness. In August 2019, after whistleblower reporting on the Siri grading program, Apple publicly apologized and restructured the program to make audio retention opt-in. In February 2023, after the Findaway exposure, Apple halted Findaway-sourced training. In May 2023, Apple announced Personal Voice as an on-device, own-voice-only feature with explicit consent protections. In June 2024, Apple introduced Applebot-Extended as a website-level opt-out for generative-AI text training. In January 2025, Apple agreed to pay $95 million to settle *Lopez* and publicly recommitted to privacy in connection with Siri. Each step was taken after the relevant harm or legal risk materialized. None was retroactive. None reached the foundational issue at the heart of this case: Apple's voice synthesis models were trained on voiceprints

and biometric information extracted without the knowledge or consent of the speakers, and those voiceprints and biometric information remain encoded in the commercial models Apple deploys today.

120. Each of the violations alleged in this Complaint was therefore committed by Apple with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026).

## CLASS ACTION ALLEGATIONS

121. Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Apple extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of any voice synthesis, speech-recognition, or related voice-AI model, during the Class Period.

122. The Class Period runs from the earlier of (a) the date Apple first ingested any voice recording into the training, fine-tuning, or evaluation pipeline for any of its voice synthesis or voice-AI models, or (b) January 1,

2010, through the date of judgment in this action. Discovery will establish the operative start date.

123. Excluded from the Class are: (i) Apple Inc. and each of its parents, subsidiaries, affiliates, and controlled entities; (ii) all current and former officers and directors of Apple and its subsidiaries; (iii) Apple's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; (vi) any person who, prior to Apple's collection or use of their voice biometric identifiers or biometric information, executed a written release that, on its face, purports to authorize Apple's use of their voice for training, fine-tuning, or operation of voice synthesis models; and (vii) all natural persons whose claims arise solely from Siri or Dictation user audio and are within the scope of the certified class in *Zaluda v. Apple Inc.*, No. 2019-CH-11771 (Cir. Ct. Cook Cnty., Ill.), provided that a member of the *Zaluda* class is not excluded from this Class if Apple also extracted a voiceprint or biometric information from that person's voice recordings in connection with the development, training, fine-tuning, evaluation, or operation of any of Apple's voice synthesis, speech-recognition, or voice-AI models.

124. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

125.   *Ascertainability.* Class membership is defined by objective criteria. Whether a particular voice recording entered the training, fine-tuning, or evaluation pipeline for any of Apple's foundational voice models is a binary factual question, and the records that answer it — training-data manifests, ingestion logs, dataset-version records, source-URL records, and audio-file metadata — are within Apple's exclusive control. For recordings distributed through Apple-owned platforms (Apple Podcasts and Apple Books), Apple also maintains comprehensive distribution metadata identifying speaker identity, geographic location of production, and content catalog. Class membership can be independently confirmed through publicly available distribution metadata on third-party platforms and through voice-matching analysis comparing Apple's voice products' outputs against publicly available recordings of Class members.

126.   *Numerosity.* Joinder is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the number of speakers whose Illinois-recorded voice work was ingested into the training pipelines for the foundational voice models runs to the hundreds of thousands. The Class includes (a) the broadcast journalists, podcasters, audiobook narrators, voice actors, voiceover artists, and other professional voice talent who produced work in Illinois during the Class Period and (b) the interviewees, guests, panelists, callers, public officials, and other speakers whose voices were captured in Illinois-produced broadcast, podcast, audiobook, and archival audio content publicly accessible on the platforms from which, on information and belief, Apple sourced training data.

The exact number is within Apple's exclusive control and will be established through discovery.

127. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Apple did not engage in any individualized notice, consent, retention-policy disclosure, written release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Apple's voice-model training pipelines. Apple's conduct was uniform: the same training pipelines ingested the same categories of voice recordings under the same absent-consent posture, applied to every Class member through the same automated and standardized process. The questions whether Apple complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements before and after extracting Class members' voiceprints can be answered classwide because Apple's noncompliance was identical as to every Class member.

128. Common questions of law and fact include, without limitation:

(a)     whether the computational representations of vocal characteristics Apple extracts during voice-model training, variously described in Apple's research as speaker embeddings, personalized embeddings, and learned representations, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b)     whether Apple informed Class members in writing that their biometric identifiers were being collected, of the specific purpose and length of

term of collection, and obtained a written release executed by the Class member, as 740 ILCS 14/15(b) requires;

(c) whether Apple developed and made publicly available a written retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training audio, as 740 ILCS 14/15(a) requires;

(d) whether Apple sold, leased, traded, or otherwise profited from Class members' biometric identifiers and biometric information through its integrated commercial chain, including the voice products at issue, in violation of 740 ILCS 14/15(c);

(e) whether Apple disclosed, redisclosed, or otherwise disseminated Class members' biometric identifiers and biometric information across its affiliates, subsidiaries, cloud-infrastructure subprocessors, and third-party vendors and service providers, without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f) whether Apple stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information as required by 740 ILCS 14/15(e)(2);

(g) whether Apple's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h) whether Apple used Class members' voices and identities for commercial purposes without prior written consent in violation of the Illinois Right of Publicity Act, 765 ILCS 1075/30(a);

(i) whether Apple's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of the Illinois Right of Publicity Act as amended by P.A. 103-836 (effective January 1, 2025), and whether Apple materially contributes to or facilitates the distribution of such replicas;

(j) whether Apple's conduct constitutes an unfair or deceptive practice within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act under *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002);

(k) whether Apple's conduct constitutes deceptive trade practices likely to cause confusion or misunderstanding as to source, sponsorship, approval, certification, affiliation, connection, or association under 815 ILCS 510/2(a)(2) and (a)(3);

(l) whether Apple was unjustly enriched by its unauthorized commercial use of Class members' voice data; and

(m) the appropriate measures of damages, restitution, and injunctive relief, including the destruction or retraining of the foundational voice models in which Class members' voiceprints are encoded and the commercial products built on those models.

68

129. *Typicality.* The named Plaintiffs' claims are typical of the Class's claims. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois. Apple, on information and belief, ingested those recordings into the training pipelines for the foundational voice models without notice, consent, or written release. With respect to Plaintiffs Dorcus and Nassif, whose audiobook narrations are distributed through Apple Books, and Plaintiffs Amer and Lacour, whose work is recognized within Apple Podcasts' editorial systems, Apple maintained direct first-party access to the recordings on its own platforms. The legal theories asserted on behalf of the Class apply with equal force to each named Plaintiff and to every other Class member.

130. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent Class members; each named Plaintiff has the same incentive as every other Class member to maximize recovery and to obtain comprehensive injunctive relief. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

131. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Apple has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Apple's training pipelines operated uniformly across every Class member's voice recordings; Apple's failure to

obtain BIPA-compliant consent was uniform; Apple's failure to publish a retention and destruction policy applicable to non-user training-data subjects was uniform; and Apple's continuing possession, commercial exploitation, and cross-affiliate and subprocessor dissemination of Class members' voiceprints in the foundational voice models that power Apple's commercial products is uniform. Plaintiffs seek classwide injunctive relief, including the destruction or retraining of the foundational voice models in which Class members' voiceprints are encoded, and the destruction of the downstream commercial products built on those models, that necessarily applies on the same terms to every Class member.

132. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate on the damages and restitutionary claims, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

133. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. *First*, whether Apple's voice-model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer. *Second*, whether Apple complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements is a common legal question with a common answer: Apple did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. *Third*, whether Apple's

70

conduct was willful or reckless turns on Apple's institutional knowledge, decision-making, and contemporaneous conduct, all of which are common to the Class. The principal individual question — whether a specific Class member's voice recordings entered the training pipelines — is binary and resolvable from Apple's own records, which include training-data manifests, ingestion logs, source-URL records, audio-file metadata, and the platform distribution metadata for the content Apple directly possesses through Apple Podcasts and Apple Books, all in Apple's exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20, as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

134.    *Superiority.* A class action is the superior method for adjudicating these claims.

(a)    *Class members' interest in individual control.* Class members are voice professionals, journalists, audiobook narrators, podcasters, voiceover artists, voice actors, and incidental speakers whose voiceprints were extracted without their knowledge. Many remain unaware that their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against one of the largest publicly traded technology companies in the world, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and

burden of independent representation. A class action is the only realistic vehicle for redress.

(b) *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Apple on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train the foundational voice models. The certified *Zaluda* class concerns Siri user audio captured through customer-initiated enrollment, a category of biometric processing not present in this case and to which no Apple customer-facing disclosure applied. The claims here arise from Apple's extraction of voiceprints from non-user voice recordings that no Plaintiff or Class member submitted to Apple. The two cases address distinct categories of Apple's voice processing.

(c) *Desirability of concentration in this forum.* Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Apple conducts substantial commercial business in Illinois through retail stores, online services, subscription products, the App Store, Apple Podcasts, and Apple Books. The Northern District of Illinois has substantial expertise with BIPA litigation and is the natural forum for adjudication of Illinois residents' Illinois-statutory claims arising from Apple's commercial conduct in Illinois.

(d) *Manageability.* The case is manageable as a class action. Apple's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be determined from Apple's records, supplemented as needed by publicly available

distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim.

135. *Tolling and continuing violations.* To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Apple's concealment of its training-data sources, by Apple's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Apple had ingested their recordings into its training pipelines, and by the continuing nature of Apple's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational voice models in which the unlawfully obtained biometric data is encoded, each disclosure or transmission of that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 216 N.E.3d 918 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

136. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

137. Plaintiffs bring this Count individually and on behalf of the Class.

138. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

139. Apple is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

140. Apple collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class members by ingesting their voice recordings into its training pipelines and extracting from those recordings computational representations capable of identifying the speakers, as alleged at ¶¶ 38-42. The resulting representations—variously denominated as speaker embeddings, audio tokens, voice prompts, acoustic features, and the parameters encoding speaker characteristics in Apple's technical and product documentation—are voiceprints and biometric information within the meaning of BIPA.

141. Apple did not, before extracting Plaintiffs' or Class members' voiceprints and biometric information, inform any Plaintiff or Class member in

writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Apple obtained no consent of any kind, in any form, from any Plaintiff or Class member, as alleged at ¶¶ 47, 78.

142. Apple's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 104–119. In the alternative, Apple's violations were negligent.

143. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member and each violation, the greater of liquidated damages of $1,000 (negligent) or $5,000 (intentional or reckless) or actual damages, on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); injunctive relief on the terms set forth in the Prayer for Relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

### Count II

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)

*Brought on behalf of the Class*

144. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

145. Plaintiffs bring this Count individually and on behalf of the Class.

146. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made

75

available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Plaintiffs and Class members never interacted with Apple in connection with the collection of their biometric data, the operative destruction prong is that the biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

147. Apple has been, and remains, in possession of voiceprints and biometric information extracted from the voice recordings of Plaintiffs and Class members. Those voiceprints and biometric information persist in the parameters of Apple's foundational voice synthesis models and continue to be deployed in the commercial products Apple ships today, as alleged at ¶¶ 37, 42.

148. Apple has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training data and encoded in the parameters of Apple's foundational voice synthesis models, as alleged at ¶¶ 47, 51. Apple's only public retention statements address Siri user request history and opted-in audio interactions. Those categories have no application to Plaintiffs and Class members, who never made a Siri request, never opted into any Apple speech program, and never had any "last interaction" with Apple in connection with the biometric data Apple extracted from them.

149. Apple's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 104–119. In the alternative, Apple's violations were negligent.

150. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count III

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)

*Brought on behalf of the Class*

151. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

152. Plaintiffs bring this Count individually and on behalf of the Class.

153. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond selling, leasing, or trading.

154. Apple has profited, and continues to profit, from Plaintiffs' and Class members' voiceprints and biometric information through the integrated commercial chain alleged at ¶¶ 65–71, including: (i) sales of consumer devices that incorporate Apple's voice technology; (ii) sales and revenue-sharing under the "Narrated by Apple Books" digital narration program; (iii) subscription-services revenue for Apple services that incorporate Apple's voice technology; (iv) developer-ecosystem and App Store revenue derived from third-party applications that depend on Apple's voice and speech models; and (v)

audiobook distribution revenue through Apple Books, the same platform on which Apple distributes Plaintiffs Dorcus's and Nassif's human narrations and through which Apple now sells competing synthetic narration generated from their voices. Apple's profiting from Plaintiffs' and Class members' biometric identifiers does not fall within any exception to § 15(c).

155. Apple's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 104–119. In the alternative, Apple's violations were negligent.

156. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count IV

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)

*Brought on behalf of the Class*

157. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

158. Plaintiffs bring this Count individually and on behalf of the Class.

159. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

160. Apple has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information in two categories of conduct, each independently sufficient to violate § 15(d) and as alleged at ¶¶ 72-75.

78

161. *First*, Apple has, on information and belief, transferred the foundational voice synthesis models, and the voiceprints and biometric information encoded within them, among Apple's affiliated corporate entities in the ordinary course of Apple's voice business, including Apple Operations International, Apple Distribution International Ltd., and Apple Operations Europe in connection with the international distribution of Apple's voice-enabled products and services; Apple Singapore Pte. Ltd. and Apple South Asia Pte. Ltd. in connection with regional operations; and Beats Electronics, LLC in connection with the integration of voice technology into Apple's audio hardware product line.

162. *Second*, Apple has, on information and belief, transmitted the foundational voice synthesis models, and the voiceprints and biometric information encoded within them, to vendors, service providers, and cloud-infrastructure partners, including Apple's Private Cloud Compute infrastructure, in the ordinary course of training, evaluating, deploying, and operating its commercial voice products. Each transfer, transmission, and dissemination constitutes a separate violation of § 15(d). Plaintiffs and Class members did not consent to any of these disseminations, and no enumerated exception under § 15(d) applies.

163. Apple's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 104–119. In the alternative, Apple's violations were negligent.

164. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count V

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)

*Brought on behalf of the Class*

165. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

166. Plaintiffs bring this Count individually and on behalf of the Class.

167. Section 15(e) of BIPA imposes two distinct duties on private entities in possession of biometric data: under § 15(e)(1), to store, transmit, and protect the data using the reasonable standard of care within the entity's industry; and under § 15(e)(2), to do so in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: an entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

168. Apple fails the § 15(e)(2) asymmetry test. Apple is institutionally defined in substantial part by its sophistication in biometric data handling. Apple's Touch ID, Face ID, and Personal Voice systems, alleged at ¶¶ 48–52, treat user biometric data as the most sensitive category of data Apple's systems handle: hardware-isolated within the Secure Enclave, encrypted, never

transmitted off the device, inaccessible to Apple itself and to applications, and restricted in scope to authentication or own-voice synthesis.

169. Apple's treatment of the non-user voiceprints and biometric information at issue is materially less protective. On information and belief, those voiceprints are encoded in the parameters of Apple's foundational voice synthesis models and disseminated across Apple's cross-affiliate, subprocessor, and cloud-infrastructure network, as alleged at ¶¶ 70–72, without any documented hardware isolation, cryptographic regime, on-device processing constraint, scope restriction, access control, retention schedule, destruction policy, or subject-access mechanism specifically applicable to that voice category. Apple has not publicly identified that it possesses non-user voiceprints, has not described any protections applicable to them, and has provided no mechanism by which Plaintiffs or Class members can inquire about, access, correct, or delete them, as alleged at ¶ 78. The asymmetry is, in operational terms, total: Apple treats user biometric data as the most sensitive category of data its systems handle; Apple has provided no documented protection for non-user voiceprints.

170. Independently, Apple fails the § 15(e)(1) reasonable-standard-of-care test. The reasonable standard of care in the consumer-technology, generative-AI, and biometric-authentication industries in which Apple operates includes hardware isolation, cryptographic encryption in storage and transit, documented retention and destruction policies, scope restrictions, and subject-access mechanisms. Apple itself meets each of these standards with respect to

the user biometric data it handles through Touch ID, Face ID, and Personal Voice. Apple meets none of them with respect to the non-user voiceprints at issue here. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of that data.

171. The asymmetry is reinforced by Apple's own internal selectivity: Apple built consent and protective infrastructure for the voice categories it collects with user participation but built none for the voiceprints it extracted from non-user training audio, as alleged at ¶¶ 112-115. The decision was a contemporaneous institutional choice.

172. Apple's violations of § 15(e)(1) and § 15(e)(2) were intentional or reckless, or in the alternative negligent, as alleged at ¶¶ 104–119.

173. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count VI

### Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.

*Brought on behalf of the Class*

174. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

175. Plaintiffs bring this Count individually and on behalf of the Class.

176. IRPA recognizes that the "right to control and to choose whether and how to use an individual's identity for commercial purposes" belongs to the individual. 765 ILCS 1075/10. "Identity" is defined to include an individual's

82

"voice." 765 ILCS 1075/5. IRPA prohibits using an individual's identity for commercial purposes without prior written consent. 765 ILCS 1075/30(a).

177. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

178. Apple used Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a). Apple extracted and modeled the distinctive vocal characteristics embodied in Plaintiffs' and Class members' recordings and used those characteristics to develop, train, and operate commercial voice synthesis products that Apple monetizes through the integrated commercial chain alleged at ¶¶ 65–71, including Siri, Personal Voice, "Narrated by Apple Books" digital narration, Live Speech, Dictation, and the SFSpeechRecognizer and SpeechAnalyzer developer APIs. Apple holds out its products' ability to generate realistic, expressive, and diverse human-sounding voices as a core commercial feature—a capability built on the vocal identities of the individuals whose recordings were used for training.

179. Apple did not obtain written consent from Plaintiffs or Class members for any commercial use of their identities.

180. Independently and additionally, the 2024 amendments to IRPA, P.A. 103-836 (eff. Jan. 1, 2025), prohibit knowingly distributing or making available to the general public a sound recording containing an "unauthorized

83

digital replica"—defined as a newly created computer-generated sound recording in which an individual's voice is fixed in a manner that would cause a reasonable person to believe the individual actually performed in the sound recording, where the individual did not actually perform and did not authorize the use of his or her identity. 765 ILCS 1075/5; 765 ILCS 1075/30(b). IRPA also imposes liability on any person who "materially contributes to, induces, or facilitates" such distribution. 765 ILCS 1075/30(d).

181. Apple's commercial voice synthesis products generate and distribute voice outputs that simulate the distinctive vocal characteristics of speakers whose recordings were ingested into Apple's training pipelines, including Plaintiffs and Class members. Apple's "Narrated by Apple Books" digital narration program distributes synthetic-narration audiobooks generated by voice models trained on the voices of human narrators. Apple's Siri text-to-speech voices, deployed across iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV, generate voice outputs whose characteristics are encoded in foundational models built from training recordings. On information and belief, the synthetic-voice outputs Apple generates and distributes include audio in which the vocal characteristics of Plaintiffs and Class members are reproduced. By generating and distributing those outputs through Apple Books, Apple Music, and other Apple commercial distribution channels, Apple, on information and belief, knowingly distributes and makes available sound recordings containing unauthorized digital replicas, and

84

knowingly materially contributes to and facilitates the distribution of such replicas.

182. Apple's violations of IRPA were willful and knowing. Apple launched Personal Voice in September 2023 as an on-device, own-voice-only feature with explicit consent protections designed to prevent unauthorized voice cloning of third parties, as alleged at ¶¶ 44 and 112–113. Apple implemented those consent protections for the user's own voice. It did not implement comparable consent protections for the third parties whose voices it had already used to train the foundational voice models on which Personal Voice and Apple's other voice products rely. Apple's broader willfulness with respect to its voice training data is alleged at ¶¶ 104–119.

183. Plaintiffs and the Class have suffered and continue to suffer injury, including loss of control over commercial use of their identities, dilution and commodification of their voices, displacement in the professional markets where they earn their livelihoods, and economic losses including diversion of licensing value and diminished demand for authentic vocal performances. The market substitution Apple's voice products effect against Plaintiffs and Class members is alleged at ¶¶ 98–103.

184. Plaintiffs and the Class seek all relief available under IRPA, including actual damages sustained as a result of Apple's unauthorized commercial use of their identities; the profits Apple earned from that unauthorized use to the extent not taken into account in computing actual damages; statutory minimum damages of $1,000 per violation; punitive

damages; injunctive relief on the terms set forth in the Prayer for Relief; reasonable attorneys' fees and costs under 765 ILCS 1075/55; and such other relief as the Court deems just and proper.

## Count VII

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

*Brought on behalf of the Class*

185. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

186. Plaintiffs bring this Count individually and on behalf of the Class.

187. Apple engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis products and services to Illinois residents and by collecting, extracting, and commercially exploiting the biometric identifiers and biometric information of Illinois residents through the integrated commercial chain alleged at ¶¶ 65–71.

188. Apple's conduct is "unfair" within the meaning of ICFA under the three-part test articulated in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). *First*, Apple's conduct offends Illinois public policy as embodied in BIPA and IRPA—Illinois statutes specifically enacted to protect biometric privacy and the commercial use of personal identity.

189. *Second*, Apple's conduct causes substantial economic and privacy injury to Illinois residents, including the irreplaceable loss of control over biometric identifiers, the unauthorized commercial use of vocal identities, and

market displacement in the professional voice industries where Plaintiffs and Class members earn their livelihoods.

190. *Third*, the injury could not reasonably have been avoided by Plaintiffs and Class members, who had no knowledge that their voice recordings were being ingested into Apple's training pipelines, no notice of the extraction, no mechanism to refuse or opt out, and no mechanism even to discover whether their biometric data was in Apple's possession.

191. Apple's conduct is independently deceptive within the meaning of ICFA. Apple maintained, and continues to maintain, total opacity about the sources of its voice synthesis training data while commercially exploiting that data at scale, as alleged at ¶¶ 53–55. Apple's public-facing voice-data privacy disclosures avoid the words "voiceprint," "speaker embedding," and "biometric identifier" — terminology Apple uses fluently elsewhere in its biometric documentation — obscuring the nature of the data Apple collects and processes from non-users, as alleged at ¶¶ 51, 111.

192. Apple has affirmatively described the training-data provenance of its general-purpose Apple Intelligence text foundation models, stating that those models were trained on "data we have licensed from publishers, curated publicly available or open-sourced datasets and publicly available information crawled by our web crawler, Applebot." Apple has made no equivalent affirmative statement about the training-data provenance of its voice synthesis models. The asymmetric disclosure creates a misleading impression about Apple's commitment to training-data transparency. Apple's voice synthesis

products generate voice outputs that sound like authentic human speech without disclosure that the underlying models were built on voiceprints and biometric information collected without consent.

193. Apple's unfair and deceptive conduct proximately caused actual economic injury to Plaintiffs and the Class, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Apple's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, not from the mere existence of competing AI products.

194. Apple's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and the Class, as alleged at ¶¶ 104–119.

195. Plaintiffs and the Class seek all relief available under ICFA, including actual economic damages sustained as a result of Apple's unfair and deceptive practices, punitive damages under 815 ILCS 505/10a(c), injunctive relief on the terms set forth in the Prayer for Relief, attorneys' fees and costs under 815 ILCS 505/10a, and such other relief as the Court deems just and proper.

### Count VIII

### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.

*Brought on behalf of the Class (injunctive relief only)*

196. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

197. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

198. Apple has engaged in deceptive trade practices likely to cause confusion or misunderstanding in the marketplace within the meaning of 815 ILCS 510/2(a)(2) (causing likelihood of confusion or misunderstanding as to the source of goods or services) and 815 ILCS 510/2(a)(3) (causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another). Apple's voice synthesis products generate voice outputs that simulate authentic human speech and are distributed through Apple Books, Apple Music, Apple Podcasts, and other Apple commercial channels—distribution channels also used by authentic human voice professionals, including Plaintiffs and Class members. Once generated, these outputs can be downloaded, shared, distributed, and commercially exploited without consumer-facing disclosure that the underlying models were built on voiceprints and biometric information collected without consent, or that the speakers whose vocal characteristics are being reproduced did not authorize the use. This creates a likelihood of confusion about whether real human speakers created, endorsed, or authorized the synthetic-voice content.

199. Plaintiffs and Class members are persons likely to be damaged by Apple's deceptive practices. Apple's conduct diverts demand from licensed human voice performances, impairs attribution and provenance in the voice services markets where Plaintiffs and Class members earn their livelihoods, and creates marketplace confusion about the source and authorization status

of AI-generated voice content. Under 815 ILCS 510/3, actual confusion and actual damages need not be shown.

200. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Apple to provide adequate consumer-facing disclosure that voice outputs are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use, together with such other corrective measures as the Court deems necessary to prevent confusion regarding the source, authorization, and consent status of AI-generated voice content distributed by Apple. Upon a finding of willfulness, Plaintiffs and the Class also seek reasonable attorneys' fees under 815 ILCS 510/3.

## Count IX

### Unjust Enrichment (Illinois Common Law)

*Brought on behalf of the Class*

201. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

202. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

203. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's

detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

204. Apple obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, biometric information, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Apple's foundational voice synthesis models; the product capability and competitive advantage Apple captured by training its models on a diverse corpus of professional and incidental human voices, including the voices of Plaintiffs and Class members; and the revenue Apple generates and continues to generate through the integrated commercial chain alleged at ¶¶ 65–71.

205. Apple obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional or otherwise valuable recordings. Apple's unauthorized extraction of voiceprints and biometric information from those recordings diverted economic value from Plaintiffs and Class members to Apple, and Apple's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods, as alleged at ¶¶ 98–103.

206. Apple's retention of these benefits is unjust. Apple's conduct violated the Illinois statutory protections for biometric data (BIPA) and for

personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Apple's institutional practice confirms the inequity of its retention: Apple built and deployed consent infrastructure for its users—Touch ID, Face ID, Personal Voice, Siri-user consent flows, the Applebot-Extended text-content opt-out, as alleged at ¶¶ 43-47—but did not apply equivalent infrastructure to the speakers whose recordings Apple ingested for voice-synthesis training. Apple could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

207. Plaintiffs and the Class seek restitution of the benefits Apple has unjustly retained, including disgorgement of profits Apple earned from the unauthorized exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and identities; an accounting of those benefits; and such other equitable relief as the Court deems just and proper, on the terms set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court:

A. *Class certification.* Certify the proposed Class under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

B.      *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendant Apple Inc. on all Counts on which Apple is found liable;

C.      *Injunctive relief.* Enter declaratory and injunctive relief, including a permanent injunction:

(1)      Enjoining Apple from collecting, capturing, obtaining, ingesting, processing, or using voiceprints, biometric identifiers, or biometric information from any voice recording produced or recorded in Illinois unless Apple has first complied with 740 ILCS 14/15(b)'s notice, written-purpose-and-duration, and written-release requirements with respect to the speaker;

(2) Requiring Apple to develop, publish, and maintain a written retention and destruction policy, made available to the public, that complies with 740 ILCS 14/15(a) and that applies to all voiceprints and biometric information extracted from voice recordings ingested into Apple's voice synthesis, speech-recognition, and related voice-AI training pipelines, including all such data already in Apple's possession at the time of judgment;

(3) Requiring Apple to identify, in a court-supervised disclosure to Class counsel and to the Court, the sources, scale, provenance, and acquisition pathways of the voice data used to train each of Apple's voice synthesis, speech-recognition, and related voice-AI models during the Class Period, including each contractual instrument, platform, dataset, and corpus from which voice recordings were obtained;

(4) Requiring Apple to provide, on terms approved by the Court, a mechanism by which non-users, including Plaintiffs and Class members, can (i) request notice of whether their voice recordings were ingested into Apple's training pipelines, (ii) request access to the biometric data Apple holds derived from their recordings, (iii) request correction or deletion of that data, and (iv) opt out of further use of that data in Apple's voice synthesis models and downstream commercial products;

(5) Requiring Apple to identify and disclose every Apple subsidiary, affiliate, vendor, service provider, and third-party processor with access to the voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois, and to terminate any access by such entities that is not necessary to compliance with this Court's order;

(6) Requiring Apple to destroy, or to retrain without the unlawfully obtained data, every voice synthesis, speech-recognition, and related voice-AI model in which voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois are encoded, together with each downstream model, fine-tuned model, derivative model, and commercial product whose operation depends on or incorporates those models;

(7) Requiring Apple to implement protective measures for any voiceprints or biometric information lawfully obtained going forward that satisfy 740 ILCS 14/15(e), including, at a minimum, the storage, transmission, encryption, isolation, scope-restriction, and access-control measures Apple

94

applies to user biometric data through Touch ID, Face ID, and Personal Voice; and

(8) Requiring Apple to implement corrective consumer-facing disclosures, in such form as the Court approves, sufficient to inform consumers that voice outputs are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use, and to prevent confusion under 815 ILCS 510/2(a)(2) and (a)(3) about the source, authorization, and consent status of AI-generated voice content Apple distributes;

D. *BIPA statutory damages.* Award liquidated or actual damages on a per-person, per-subsection basis under 740 ILCS 14/20, as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $5,000 per intentional or reckless violation, or in the alternative $1,000 per negligent violation, for violations of 740 ILCS 14/15(a), (b), (c), (d), and (e);

E. *IRPA damages.* Award actual damages, statutory damages of $1,000 per violation, punitive damages, and disgorgement of profits under 765 ILCS 1075/40;

F. *ICFA damages.* Award actual economic damages and punitive damages under 815 ILCS 505/10a;

G. *Disgorgement and restitution.* Award disgorgement of Apple's ill-gotten gains and restitution to Plaintiffs and the Class, including disgorgement

95

attributable to Apple's consumer-device sales channel, the "Narrated by Apple Books" digital narration program, Apple's subscription services that incorporate voice technology, Apple's developer-ecosystem and App Store revenue from third-party applications dependent on Apple's voice and speech models, and Apple's audiobook distribution through Apple Books;

H.      *Non-duplication.* Order such relief as the Court determines necessary to ensure no duplicative recovery across statutory, common-law, and equitable claims;

I.      *Attorneys' fees and costs.* Award reasonable attorneys' fees and litigation costs under 740 ILCS 14/20, 765 ILCS 1075/55, 815 ILCS 505/10a, 815 ILCS 510/3, and any other applicable provision;

J.      *Pre- and post-judgment interest.* Award pre- and post-judgment interest as permitted by law;

K.      *Service awards.* Award service awards to Plaintiffs in such amount as the Court deems appropriate to compensate them for their services to the Class; and

L.      *Such other relief as is just and proper.* Grant such other and further relief as the Court deems just and proper.

## JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 12, 2026        LOEVY & LOEVY

/s/ Ross Kimbarovsky

_____

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Yohance Lacour, Carol Marin, Philip Rogers, Robin Amer, Lindsey Dorcus, and Victoria Nassif.*